1   Gregory P. Stone (SBN 078329)
    Andrea Weiss Jeffries (SBN 183408)
2   Fred A. Rowley, Jr. (SBN 192298)
    MUNGER, TOLLES & OLSON LLP
3   355 South Grand Avenue, 35th Floor
    Los Angeles, CA 90071-1560
4   Telephone: (213) 683-9100
    Facsimile: (213) 687-3702
5   Email: gregory.stone@mto.com
    Email: andrea.jeffries@mto.com
6   Email: fred.rowley@mto.com

7   Peter A. Detre (SBN 182619)
    Carolyn Hoecker Luedtke (SBN 207976)
8   Rosemarie T. Ring (SBN 220769)
    Jennifer L. Polse (SBN 219202)
9   MUNGER, TOLLES & OLSON LLP
    560 Mission Street, 27th Floor
10  San Francisco, CA 94105
    Telephone: (415) 512-4000
11  Facsimile: (415) 512-4077
    Email: peter.detre@mto.com
12  Email: carolyn.luedtke@mto.com
    Email: rose.ring@mto.com
13  Email: jen.polse@mto.com

                                                    Rollin A. Ransom (SBN 196126)
                                                    SIDLEY AUSTIN LLP
                                                    555 West Fifth Street, Suite 4000
                                                    Los Angeles, CA 90013-1010
                                                    Telephone: (213) 896-6000
                                                    Facsimile: (213) 896-6600
                                                    Email: rransom@sidley.com

                                                    Pierre J. Hubert (Pro Hac Vice)
                                                    Craig N. Tolliver (Pro Hac Vice)
                                                    McKOOL SMITH PC
                                                    300 West 6th Street, Suite 1700
                                                    Austin, TX 78701
                                                    Telephone: (512) 692-8700
                                                    Facsimile: (512) 692-8744
                                                    Email: phubert@mckoolsmith.com
                                                    Email: ctolliver@mckoolsmith.com

14  Attorneys for RAMBUS INC.

15              UNITED STATES DISTRICT COURT

16      NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

17

18  HYNIX SEMICONDUCTOR, INC., et al.,          CASE NO.:  CV 00-20905 RMW

19                      Plaintiffs,             **BRIEF OF RAMBUS INC. IN
                                                OPPOSITION TO HYNIX'S MOTION FOR
20          vs.                                 STAY OF EXECUTION OF MONEY
                                                JUDGMENT AND FOR PERMISSION TO
21  RAMBUS INC.,                                POST ALTERNATIVE SECURITY**

22                      Defendant.

23                                              **[PUBLIC REDACTED VERSION]**

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3  I.     INTRODUCTION ................................................................................................ 1

4  II.    STATEMENT OF FACTS ................................................................................... 2

5         A.     Hynix's Current Financial Condition.................................................... 3

          B.     The Outlook for the DRAM Industry and Hynix's Business................... 4

6  III.   ARGUMENT ...................................................................................................... 5

7         A.     Hynix Has Not Satisfied, and Cannot Meet, its Burden to Show that the
                 Full Supersedeas Bond Is Impracticable and that its Proposed Security
8                Arrangement Adequately Protects Rambus ............................................. 5

9                1.      Hynix's Factual Showing Fails to Demonstrate that a Full Bond is
                         Impracticable or Impossible, and Raises More Questions than it
10                       Answers About Hynix's Finances................................................ 6

11               2.      Hynix's Own Public Predictions and Financial Statements Suggest
                         the Portrayal of Desperation in its Motion is Overwrought.............. 7

12

13               3.      Hynix Has Not Shown that it Has Explored or Pursued All Potential
                         Means for Obtaining a Bond .................................................... 11

14               4.      ███████████████████████████████████
                         ███████████████████████ 14

15        B.     ██████████████████████████████████████
16               ██████████████████████████████ 15

17               1.      The Liens Proposed by Hynix Are Too Dubious in Value and Too
                         Cumbersome to Give Rambus Any Meaningful Security........................ 15

18               2.      Hynix's Alternative Security Would Unfairly Shift Risk to Rambus,
                         Undercutting the Purpose of Rule 62 ........................................ 19
19

20               3.      Any Alternative to a Full Bond Should Provide Rambus With a
                         Reliable and Readily Enforceable Security Interest................................ 20

21        C.     Hynix Should Be Required to Pay the Forward-Looking Royalties Directly
                 to Rambus or, At a Minimum, Into Escrow ......................................... 21

22 IV.    CONCLUSION ................................................................................................ 25

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Amado v. Microsoft Corp.,*
  517 F.3d 1353 (Fed. Cir. 2008)........................................................................... 22

*Bank of Nova Scotia v. Pemberton,*
  964 F. Supp. 189 (D. V.I. 1997) ......................................................................... 15

*Bethel v. McAllister Ros., Inc.,*
  1994 WL 2300740 (E.D. Pa. May 19, 1994) ...................................................... 10

*Bolt v. Merrimack Pharm., Inc.,*
  2005 WL 2298423 (E.D. Cal. Sept. 20, 2005).................................................. 6, 21

*Broadcom Corp. v. Qualcomm Inc.,*
  585 F. Supp. 2d 1187 (C.D. Cal. 20008) .......................................................... 21, 22

*C. Albert Sauter Co. v. Richard s. Sauter Co.,*
  368 F. Supp. 501 (E.D. Pa. 1973) ....................................................................... 19

*Dillon v. City of Chicago,*
  866 F.2d 902 (7th Cir. 1988)............................................................................... 18

*Enserch Corp. v. Shand Morahan & Co., Inc.,*
  918 F.2d 462 (5th Cir. 1990)............................................................................... 25

*Feldman v. Philadelphia Housing Authority,*
  1994 WL 46514, at *3 (E.D. Pa. 1994) ................................................................ 9

*Hamlin v. Charter Twp. Of Flint,*
  181 F.R.D. 348 (E.D. Mich. 1998) ..................................................................... 20

*HCB Contractors v. Rouse & Assocs.,*
  168 F.R.D. 508 (E.D. Pa. 1995)...................................................................... 1, 5, 6

*In re Hayes Microcomputer Prods., Inc. Patent Litig.,*
  982 F.2d 1527 (Fed. Cir. 1992).......................................................................... 22

*Int'l Telemeter Corp. v. Hamlin Int'l Corp.,*
  754 F.2d 1492 (9th Cir. 1985)............................................................................... 5

*Key Corp. Capital, Inc., v. Tilley,*
  2005 WL 182707 (E.D. Pa. Jan. 27, 2005) ........................................................ 15

*Lightfoot v. Walker,*
  797 F.2d 505 (7th Cir. 1986)................................................................ 17, 18, 19, 20

*NLRB v. Westphal,*
  859 F.2d 818 (9th Cir. 1988)............................................................................... 11

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.,*
  786 F.2d 794 (7th Cir. 1986)........................................................................*passim*

*Paice LLC v. Toyota Motor Corp.,*
  504 F.3d 1293 (Fed. Cir. 2007).......................................................................... 22

*Poplar Grove v. Bache Halsey Stuart, Inc.,*
  600 F.2d 1189 (5th Cir. 1979).................................................................... 2, 6, 20

1

**TABLE OF AUTHORITIES**
(continued)

2

Page(s)

3    *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
        897 F.2d 511 (Fed. Cir. 1990) ................................................................................ 22

4    *Townsend v. Holman Consulting Corp.*,
        881 F.2d 788 (9th Cir. 1989) .................................................................................. 16

5

     *TWA, Inc. v. Hughes*,
6        515 F.2d 173 (9th Cir. 1975) .................................................................................. 19

7    *Voda v. Cordis Corp.*,
        2006 WL 2570614 (W.D. Okla. Sept. 5, 2006) ...................................................... 20

8    *Willis v. Celolex Corp.*,
        978 F.2d 146 (4th Cir. 1992) .................................................................................. 14

9
     *z4 Techs., Inc. v. Microsoft Corp.*,
10       434 F. Supp. 2d 437 (E.D. Tex. 2006) .................................................................... 24

11                                    **FEDERAL RULES**

12   Fed. R. Civ. P. 62 ............................................................................................. passim

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RAMBUS'S OPPOSITION TO HYNIX'S MOTION FOR
STAY OF EXECUTION OF MONEY JUDGMENT;
CASE NO. CV 00-20905 RMW

1  **I.     INTRODUCTION**

2         The bond motion filed by Hynix (the "Motion") is remarkable not for what it says, but for

3  what it does *not* say.  Hynix never claims that there was no surety willing to offer a full

4  supersedeas bond on any terms. ████████████████████████████████████████████

5  ███████████████████████████████████████████████████████████.  And it does

6  not say that its creditors rejected any specific efforts to fund a full bond.  Instead, Hynix's brief

7  carefully frames its efforts, alleging that Hynix "believes" (but does not know) it cannot obtain a

8  full bond and that such a bond is "effectively" (but not actually) unavailable.  (Mot. at 10-11.)

9  ███████████████████████████████████████████████████████████████████████████

10 █████████████████████████████████████████████████████████████████████████

11 ████████████  This makes obtaining a full bond an "extraordinary challenge" (but not an

12 insuperable one).  (*Id.* at 2.)

13        Hynix's unwillingness to show, or even say, that it cannot obtain a bond is curious, but is

14 ultimately explained by the things that Hynix *has* said elsewhere about its finances and business.

15 In earnings calls, statements to the press, and financial statements, Hynix has indicated that it has

16 ample financial resources despite the "conditions in the DRAM industry" and the "severe

17 contraction" in the credit markets.  (Mot. at 10, 2.)  Hynix has stated that it expects DRAM prices

18 to *rise* in the coming year, and that it will return to profitability.  It has taken the position with

19 investors that the same DRAM bankruptcies it laments in its brief will *strengthen* the company's

20 overall position in the DRAM market.  Consistent with these predictions, Hynix is reportedly

21 making massive capital investments and raising its DRAM prices; its stock price has soared since

22 January; and just this week, it announced a plan, approved by its creditors, to raise $889 million

23 in new financing.

24        All of these resources can and should be brought to bear to satisfy the bond in this case.

25 That Hynix has not done so—and that its executives do not even mention them in their supporting

26 declarations—indicates that Hynix simply does not want to pay for a full bond.  This is not a

27 legitimate reason to waive the bond requirement in Rule 62.  Because that requirement serves to

28 ensure that an appeal will not compromise a prevailing party's ability to collect on a judgment, it

1    is waived only in "extraordinary circumstances." *HCB Contractors v. Rouse & Assocs.*, 168

2    F.R.D. 508, 512 (E.D. Pa. 1995) (citations omitted).  Hynix's Motion fails this standard, not only

3    because it has made no showing that a bond would be impracticable, but also because its

4    alternative scheme is utterly inadequate to secure Rambus's interests.

12   Finally, Hynix has failed to satisfy the requirements for staying the forward-looking

13   royalty ordered by this Court, whether in the form of accrual or payments into escrow.  A

14   compulsory license entails, as its defining feature, the obligation to pay the *patentholder* royalties.

15   To obtain relief from that duty, Hynix must demonstrate, *inter alia*, a likelihood of success and

16   irreparable harm.  Because it cannot make this showing, the Court should adhere to its judgment

17   and order Hynix to pay royalties directly to Rambus.  At a minimum, it should order Hynix to pay

18   the royalties into escrow.  Allowing Hynix to continue infringing while retaining the royalties it

19   owes would effectively set Rambus's exclusivity rights at naught; those payments are the only

20   way, short of an injunction, of vindicating Rambus's patent rights for their remaining life.

21   **II.      STATEMENT OF FACTS**

22   Hynix's factual presentation focuses on two issues raised by its obligation to post a bond:

23   (1) Hynix's current financial condition; and (2) the state of the DRAM industry, and the future

24   prospects for both that industry and Hynix itself.  Although Rambus bears no burden on any of

25   these points, *see Poplar Grove v. Bache Halsey Stuart, Inc.*, 600 F.2d 1189, 1191 (5th Cir. 1979),

26   Rambus sets forth the following to provide the Court with a more complete picture of the facts:

27

28

RAMBUS'S OPPOSITION TO HYNIX'S MOTION FOR
STAY OF EXECUTION OF MONEY JUDGMENT
CASE NO. CV 00-20905 RMW

A.    **Hynix's Current Financial Condition**

In setting out Hynix's financial condition, Hynix Treasurer Yoo Ho Roh focuses on its

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████  But Hynix's financial statements and public statements, as well as news reports,

shed light on the *current* state of its finances.  These sources indicate that Hynix is in stronger

financial health, with more resources at its disposal, than Mr. Roh suggests:

First, the price of Hynix stock has increased by 64.5% in the first three months of this

year.  (Jacobs Decl. ¶ 24.)[1]  When share prices rise, it is easier for a company to raise money

through equity, because existing shareholders suffer less dilution.  (*Id.*)  Indeed, Hynix just

recently announced plans to raise an additional $520 million through a rights offering.  (Wu

Decl.[2], Ex. A (Hynix Set to Raise Cash from Bourse, *Korea Times*, Apr. 9, 2009).)

Second, Hynix's cash on hand may be replenished by its revenues.  ████████████

████████████████████████████████████████████████████████████████████████████

But Hynix took in $567.9 million in accounts receivable even in the fourth quarter (Jacobs Decl.

¶ 19), at the end of what Hynix has called "the worst year for the memory market" (Wu Decl., Ex.

B (Transcript of FY 2008 Earnings Call, February 4, 2009) at 2).  Hynix itself has given good

reason to expect that its cash reserves will stabilize this year, as the company has forecast both

higher DRAM prices and a return to profitability.  (*See* discussion *infra* at 7-12.)

Third, ████████████████████████████████████████████  news reports

indicate that it recently obtained approval from creditors to raise $889.9 million, including the

aforementioned rights offering.  (Wu Decl., Ex. C (Hynix May Raise $ 900 mln in 2009, Reuters,

Apr. 8, 2009); *see also* Wu Decl., Ex. B.)  ████████████████████████████

████████████████████████████████████  Evidently, Hynix's own creditors continue to have

confidence in the company.

---

[1] Dr. E. Allen Jacobs is Rambus's expert on surety bonds.  His declaration is concurrently filed with this brief.

[2] Declaration of Jeffrey Y. Wu in support of this brief, filed concurrently.

1    Fourth, Hynix recently announced further steps to shore up its financial position.  On its

2    February 4, 2009 earnings call, Hynix's Senior Vice President for External Relations, O.C. Kwon,

3    announced that the company planned to generate approximately $750 million from the sale of

4    non-core assets this year.  (Dwyer Decl. ¶ 6;[3] *see also* Wu Decl., Ex. B at 8.)  Mr. Kwon stated

5    that "we are in process to sell the remaining tools from ... three fabs, Eugene, Incheon and

6    Cheongju"—█████████████████████████████████.  (Wu Decl., Ex. B at

7    8.)  "[W]e are trying to sell them off as soon as possible," Mr. Kwon explained.  (*Id.*).

8        **B.    The Outlook for the DRAM Industry and Hynix's Business**

9        In its Motion, ████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████    But Hynix's statements to investors and recent news reports paint a rather rosier picture.

13   In Hynix's recent earnings call, Mr. Kwon stated:  "[W]e are encouraged by recent signs

14   of recovery in memory prices which we hope can lead to an improved pricing environment in

15   memory market over time, thus proving the worst of the market downturn has passed."  (Wu

16   Decl., Ex B. at 2.)  Hynix has publicly stated that it believes industry conditions bottomed out in

17   the fourth quarter of last year.  (Jacobs Decl. ¶ 26; *see also* Wu Decl., Ex. D (Hynix Says Chip

18   Slump Hit Bottom, *Wall Street Journal*, Mar. 27, 2009.).)  Indeed, the Korean business press has

19   recently reported that Hynix has *already* begun negotiating with its bigger clients to raise contract

20   chip prices by 10-20 percent.  (*Id.*; *see also* Wu Decl., Ex. A.)

21       The reason Hynix has been able to raise prices is, ironically, the very bankruptcies and

22   consolidations ██████████████████████.  The failure of weaker firms will reduce

23   supply, raising prices and lifting the prospects of those firms that survive.  (Jacobs Decl. ¶ 27.)

24   Hynix's CEO, Kim Jong-kap, has stated that industry "restructuring is expected to take place,"

25   and that "[o]ut of around 10 players, three or four of those are likely to be reduced this year."

26   (*Id.*; *see also* Wu Decl., Ex D.)  As Hynix explained to investors, "ongoing consolidation of the

27   ────────────────

28   [3] Robert Dwyer, a certified public accountant, is Rambus's expert on financial analysis. His
     declaration is concurrently filed.

1   industry will constrain supply growth further and ultimately lead to a better balance of demand

2   and supply in the second half this year." (Wu Decl. Ex. B, at 2.) Nor is this merely the subjective

3   view of Hynix. Many analysts have predicted that the restructuring of the industry will benefit

4   firms like Hynix. (Jacobs Decl. ¶ 27 ("DRAM prices have steadily soared on hopes of

5   improvement among chip suppliers after Germany's Qimonda filed for insolvency. … Samsung

6   and Hynix will be winners when the swirl ends."); *see also* Wu Decl., Ex. E (Investors Returning

7   to Samsung Electronics, Hynix, *Korea Times*, Feb. 9, 2009).)

8   ## III.   ARGUMENT

9   ### A.   Hynix Has Not Satisfied, and Cannot Meet, its Burden to Show that the Full Supersedeas Bond Is Impracticable and that its Proposed Security Arrangement Adequately Protects Rambus

10

11   Hynix's entire brief is written as though its burden were merely to make a showing of

12   *some* difficulty or challenge in obtaining a supersedeas bond, leaving it to Rambus to explain why

13   Hynix can in fact afford the appeal it wishes to take. We are told that "the economic environment

14   generally" is bad (Mot. 10, 6-7), that the DRAM industry "is in serious financial difficulty" (*id.* at

15   7), and that the credit markets are tight (*id.* at 1). Based upon these general observations, Hynix

16   asserts that it faces an "extraordinary challenge" in obtaining a bond, ████████████████████

17   ██████████████████████████████████. Never mind that Hynix does not

18   actually profess an inability to meet those terms, and that Hynix alone possesses the data and

19   evidence that would definitively back up or refute such a claim. As Hynix would have it, ████

20   ███████████████████████, so it is for *Rambus* to prove that a bond

21   is practicable.

22   That is not the law. Rule 62, and the principles developed in applying it, require more

23   before a court will expose an appellee to the inherent risk of an alternative security. Although a

24   trial court has the authority to waive Rule 62's bond requirement, *see Int'l Telemeter Corp. v.*

25   *Hamlin Int'l Corp.*, 754 F.2d 1492, 1495 (9th Cir. 1985) (payment of full amount of judgment

26   into an escrow account accepted as alternative to posting a supersedeas bond), that authority "has

27   been exercised only in 'extraordinary circumstances,' and only where alternative means of

28   securing the judgment creditor's interest were available." *HCB Contractors*, 168 F.R.D. at 512

1   (citations omitted).  The caselaw is uniform that the appellant has the burden to "objectively

2   demonstrate" the reasons for "depart[ing] from the usual requirement of a full security

3   supersedeas bond." *Poplar Grove*, 600 F.2d at 1190, *cited in Int'l Telemeter*, 754 F.2d 1495.

4   Accordingly, when, as in this instance, the appellant seeks relief on the ground that it is unable to

5   obtain a bond sufficient to cover the judgment, it must show (1) that "posting a full bond in

6   impossible or impracticable"; and (2) that an alternative plan "will provide adequate (or as

7   adequate as possible) security for the appellee." *HCB Contractors*, 168 F.R.D. at 512 (citation

8   omitted); *accord, e.g., Bolt v. Merrimack Pharm., Inc.*, 2005 WL 2298423, at *3-*4 (E.D. Cal.

9   Sept. 20, 2005).  The burden rests, at every point in the analysis, with Hynix and Hynix alone.

10          Under these standards, Hynix's arguments and half-hearted factual showing fail.  Hynix's

11   evidence, when supplemented with public information omitted by Hynix, does not jibe with the

12   Motion's ███████████████████████.  The facts instead suggests that Hynix has

13   both ample financial resources and a range of options to obtain a bond.  There is accordingly no

14   justification to resort to Hynix's alternative scheme, which would saddle Rambus with assets of

15   dubious value and liquidity.

16   **1.   Hynix's Factual Showing Fails to Demonstrate that a Full Bond is
        Impracticable or Impossible, and Raises More Questions than it
17      Answers About Hynix's Finances**

18          In its motion, Hynix is careful not to say that it has been denied a bond sufficient to cover

19   the $400 million judgment.[4]  The most that Hynix says is that the Court ought to relieve it of the

20   bond requirement in Rule 62 because it is "impracticable" to secure a bond.  (Mot. at 2-3.)  But

21   far from showing an inability to finance a full bond, Hynix's factual submissions, coupled with its

22   public statements about its business and finances, suggest that Hynix either has not tried hard

23   enough or is unwilling to pay the going rate.  While portraying the DRAM industry and its own

24   finances as a shambles, Hynix has publicly suggested that things are looking up in the industry

25   and that it expects 2009 to be a "turning point" for the company.  (Wu Decl., Ex. B at 2.)  Hynix's

26   ─────────────────
     [4] Because "a supersedeas bond 'must normally be in a sum sufficient to pay the judgment and
27   costs, interest, and damages for delay,'" the bond required here would actually be larger than the
     $400 million bond Hynix assumes. *E.g., Cashman Equip. Corp. v. U.S. Fire Ins. Co.*, 2008 WL
28   5000355 (E.D. Pa. Nov. 21, 2008) (citation omitted).

1   explanation of its efforts to secure a bond is chock full of holes,



2

3

4

5

6       ## 2.    Hynix's Own Public Predictions and Financial Statements Suggest the
7            Portrayal of Desperation in its Motion is Overwrought

8       Two of the main factors that, according to Hynix, are hamstringing its effort to get a bond

9   are the state of the DRAM market and Hynix itself. (Mot. at 4, 6-7.) The thrust of this argument

10  is that the "historically low" price of DRAMs has hurt Hynix's revenues and compromised its

11  capital structure. (*Id.*) But whether or not Hynix has *generally* fallen on hard times is beside the

12  point; the question here is whether Hynix, having been found liable to Rambus for $400 million

13  in patent damages, can arrange to bond that amount through equity or debt. On that particular

14  financial issue, Hynix's own public representations and financial statements refute the company's

15  impracticability contentions.

16      Whatever the future prospects for the DRAM industry as a whole, Hynix has itself made

17  statements indicating that it is weathering the difficult conditions in the DRAM market, and that it

18  has managed to maintain financial stability. Hynix has publicly declared that it "does not expect

19  that the judgment will have *any impact on its business operations*," (Dwyer Decl. ¶ 8; Wu Decl.

20  Ex. O (Hynix Press Release, Mar. 11, 2009) (emphasis added)), suggesting that it has the

21  financial resources to continue litigating this case on appeal—including, presumably, the

22  resources required to post a bond. That declaration resonates with the statements Hynix made

23  about its financial condition in its most recent earnings call. Hynix executive O.C. Kwon

24  observed that, during the down-turn in the DRAM market, Hynix achieved "financial stability

25  through additional financing." (Wu Decl., Ex. B, at 2.) In response to questioning, Mr. Kwon

26  explained that Hynix had been able to secure sufficient support from Korean banks, and

27  accordingly had not yet resorted to international financing: "We haven't tried yet to tap other

28  [non-Korean] sources of financing while our credit banks have been cooperative to rendering the

1    additional funding to us." (*Id.* at 13.)  When asked whether Hynix planned to seek additional

2    financing, Mr. Kwon responded that the company had no immediate need for "more safety

3    cushion," but that it was "constantly reviewing various options for further funding ... to endure

4    the possibly prolonged market downturn." (*Id.*)

5         Mr. Kwon's suggestion that Hynix is financially stable is borne out by the company's

6    publicly reported data.  The market value of the company's stock is estimated to be $4.9 billion as

7    of April 3, 2009.  (Jacobs Decl. ¶ 25.)  By any measure, Hynix's financial resources are

8    substantial:

9         *Cash on Hand*:  As of December 31, 2008, Hynix reported approximately $570 million in

10   cash, cash equivalents, and short-term financial instruments.  (Dwyer Decl. ¶ 3 █████████

11   ████████████████████████████████████████████████, Hynix's most recent

12   financial statements indicate that it had $567.9 million in accounts receivables in Q4 2008.

13   (Jacobs Decl. ¶ 19.)  More importantly, Hynix's revenues are likely to increase with the price

14   increases it anticipates.  (*Id.*)

15   *Equity Issuances*: ████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████  Indeed, Hynix

19   plans to raise just that amount through a new rights offering plan announced just this week.

20   (Jacobs Decl. ¶ 30.)

21   *Debt Issuances*: ████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████

26   *Hard Assets*: _____

27   [5]  As Mr. Dwyer has explained, these figures reflect Dollar/Won conversion rates as of Apr. 9,

28   2009.  (Dwyer Decl. ¶6 n.3.)

1

2

3

4    As Rambus's surety bond expert has concluded (Jacobs Decl. ¶ 32), these resources

5    suggest that Hynix is more than able to obtain a bond for the full amount of the judgment. *Cf.*

6    *Feldman v. Philadelphia Housing Authority*, 1994 WL 46514, at *3 (E.D. Pa. 1994) (requiring

7    bond where defendant "represent[ed] it ha[d] sufficient funds it [could] set aside in order to

8    provide some security for payment"). The company has more in cash on hand than the judgment

9    itself, and its revenues should trend upward if its price projections prove correct. This suggests

10   Hynix could pay off the entire award in cash.

11                                    and it has concrete plans to raise hundreds of

12   millions of dollars more through financing and the sale of assets. That ought to give the company

13   ample breathing room to fund its operations while securing the bond necessary for its appeal.

14    In describing Hynix's financial condition, Hynix Treasurer Yoo Ho Roh fails to address or

15   even acknowledge many of these resources. Mr. Roh takes no account of Hynix's recent jump in

16   share price and business recovery.

17

18

19

20                                                                                    But

21   Mr. Roh makes no mention of the $889 million in *additional* financing that Hynix now expects to

22   raise, casting considerable doubt on his assertion that

23                                                                           If

24   Hynix's creditors are willing to issue Hynix debt or take an equity stake in order to fund capital

25   improvements or manufacturing operations, they should be willing to extend Hynix financing in

26   order to meet legal obligations attending those same core activities. And if, as Mr. Kwon

27   suggests, Hynix has yet to tap into financial resources outside Korea, the bond that Hynix must

28   post to continue litigating this case would seem an appropriate occasion to pursue that option.

1   It is incumbent upon Hynix, as the party with the burden, to explain why it cannot afford

2   to obtain a bond.  An essential part of that showing is Hynix's financial condition.  *See, e.g.*,

3   *Bethel v. McAllister Ros., Inc.*, 1994 WL 230740, at *1 (E.D. Pa. May 19, 1994) (noting that the

4   court ordered the party seeking a bond waiver "to submit financial documentation reflecting the

5   company's revenues and assets").  What Hynix has submitted, however, is an account of its

6   financial resources that is both incomplete and inconsistent with its own public statements.  Based

7   upon Hynix's submissions, there is no way to tell, with confidence, what resources the company

8   can actually bring to bear to obtain a bond.  Even with its current leveraged position, Hynix has

9   not demonstrated that it could not use its credit and assets to fund $400 million in financing on

10  *some* terms, which suggests Hynix simply has not found terms it likes.  The deficiency alone

11  forecloses any relief from Rule 62's bond requirement, for it leaves Rambus and the Court

12  without the full context needed to evaluate Hynix's purported efforts to find a surety.  But the

13  company's cry of prohibitive financial distress is even more questionable in light of its

14  contradictory positions regarding the prospects for the DRAM industry and its own business.

15  While there is no question that oversupply has placed price pressure on DRAM

16  manufacturers over the past two years, the industry has long been marked by cyclical swings in

17  price and thus profitability.  (*See, e.g.*, Wu Decl. Ex. G (Effort to Curb Illegal Electronics

18  Devices, *Idaho Statesman*, July 23, 2008 (noting "the brutally cyclical computer-memory

19  market").)  In its most recent earnings call, Hynix predicted that industry is at the verge of a

20  cyclical upswing:  "[W]e are encouraged by recent signs of recovery in memory prices which we

21  hope can lead to an improved pricing environment in memory market over time, thus proving the

22  worst of the market downturn has passed."  (Wu Decl. Ex. B, at 2.)

23  In addition to noting the prospect of price stability, Hynix's O.C. Kwon stated "we hope

24  year 2009 is another turning point for Hynix," promising to "focus on technology and cost

25  competitiveness."  (*Id.*)  Hynix is already negotiating to raise contract chip prices by 10-20%

26  (Jacobs Decl. ¶ 26), while aiming to double its share of the global mobile DRAM market this year

27  (*id.* ¶ 27).  Because Hynix appears poised to survive the recession and grow, it could emerge with

28  a *stronger* position in the DRAM market as competitors like Qimonda declare bankruptcy and

RAMBUS'S OPPOSITION TO HYNIX'S MOTION FOR
STAY OF EXECUTION OF MONEY JUDGMENT
CASE NO. CV 00-20905 RMW

1   production capacity drops.  (Jacobs Decl. ¶ 27.)  Indeed, Hynix has noted that the elimination of

2   DRAM firms could lead to constricted supply, higher prices, and better results for Hynix in 2009.

3   (Wu Decl., Ex. D.)  That statement directly contradicts Hynix's suggestion that the difficulties

4   faced by other DRAM firms bode ill for it.  (Mot. at 7.)

5          To the extent Hynix's prospects for recovery may remain less than certain, that

6   uncertainty cuts *against* relief from the bond requirement.  The entire point of a bond is to ensure

7   that Rambus can collect the judgment it has won.  *See, e.g., NLRB v. Westphal*, 859 F.2d 818, 819

8   (9th Cir. 1988) ("The posting of a bond protects the prevailing plaintiff from the risk of a later

9   uncollectible judgment….").  So long as Hynix can obtain a bond without falling into bankruptcy

10  or crippling its business—and there is every reason to believe it can (*see infra*)—then the fact that

11  things may not improve as much as Hynix predicted to investors weighs in favor of giving

12  Rambus the secure protection of a bond now.  After all, by Hynix's own estimate an appeal is

13  likely to take two years.  (*See* Hynix's Mot. for Summ. J. and for Stay at 8, filed Jan. 19, 2009.)

14              **3.      Hynix Has Not Shown that it Has Explored or Pursued All Potential
                         Means for Obtaining a Bond**
15

16         Shorn of its rhetoric, Hynix's impracticability theory reduces to the contention that "a full

17  supersedeas bond is effectively unavailable" because ███████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████ That showing is inadequate on its face, because it does not even *purport* to

20  establish that Hynix cannot actually secure a bond. ██████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████ And it ignores other possible avenues for

25  supporting a bond, including options suggested by Hynix's own papers. █████████████████████

26  ████████████████████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26        Based upon Hynix's current financial condition, there is every reason to believe that it

27    *could* obtain the required Letters of Credit or equivalent collateral, even if it means paying a

28    higher rate.  There is no inherent difference between raising general corporate funds and posting a

- 12 -

1  supersedeas bond. (*See* Jacobs Decl. ¶¶ 16-22.) In either situation, the investor or surety is

2  looking for assurance that it will be repaid, based on the company's assets and cash flow.

3  Hynix's prodigious fundraising activities provide clear evidence that it could raise the funds to

4  obtain a $400 million bond. Hynix has stated that it expects higher DRAM prices and a return to

5  profitability, which should shore up its cash reserves. Indeed, if the company's $567.9 million in

6  accounts receivables from Q4 2008 are not encumbered, it could securitize those funds to get a

7  letter of credit or bond. (Jacobs Decl. ¶ 19.) The company's rebounded stock price and market

8  cap should permit it to raise funds by issuing new stock. (*Id.* at ¶ 17.)

9  and just obtained approval to raise $889

10  million more also confirms that it has not exhausted its financing options.

11  Dwyer Decl. ¶ 8.) Indeed, Hynix itself acknowledged on its recent earnings call that "[w]e

12  haven't tried yet to tap other sources of financing." (Wu Decl., Ex. B at 13.)

13

14  . If, as Hynix claims, these properties "provide[]

15  Rambus with adequate security" (Mot. 13), Hynix should be able to mortgage the properties and

16  use the proceeds to obtain a Letter of Credit. *Cf. Willis v. Celotex Corp.*, 978 F.2d 146, 148 (4th

17  Cir. 1992) (defendant purchased certificates of deposit that it pledged to a bank, which then

18  issued Letters of Credit for a surety's use). That Hynix has not drawn on the value of these

19  properties suggests either that the properties are not as valuable and Hynix claims or that Hynix is

20  not seriously pursuing all its options.

21

22

23  . Hynix could,

24  for example, post shares or its fabs directly with the bonding company. (Jacobs Decl. ¶ 15.) It

25  could take the cash proceeds from a combination of equity offers, debt offerings, accounts

26  receivable, and mortgages and post those proceeds. (*Id.*). It could deposit those proceeds with an

27  escrow agent acting as an intermediary. (*Id.*)

28



That Hynix might
need to pay more in fees or a higher aggregate rate for these arrangements does not render them
impossible or impracticable.

The only reasonable inference from Hynix's factual presentation is not that Hynix *cannot*
obtain a bond, but that it prefers to spend its money on other things. That is simply not a
legitimate basis for relief from Rule 62's bond requirement.



1.    **The Liens Proposed by Hynix Are Too Dubious in Value and Too Cumbersome to Give Rambus Any Meaningful Security**

The law is clear that "[c]ourts will deny a motion to stay when the movant does not propose a plan that will provide adequate alternate security." *Key Corp. Capital, Inc., v. Tilley*, 2005 WL 182707, at *1 (E.D. Pa. Jan. 27, 2005); *see also Bank of Nova Scotia v. Pemberton*, 964 F. Supp. 189, 192 (D.V.I. 1997) (refusing to waive bond requirement because the defendant "utterly failed to satisfy his burden of proposing a plan to provide adequate alternate security for

1   the prevailing parties"). Because the supersedeas bond provided in Rule 62 is essentially a

2   "judgment insurance policy," *Townsend v. Holman Consulting Corp.*, 881 F. 2d 788, 797 (9th

3   Cir. 1989), an alternative security must be sufficiently reliable and executable to serve that

4   purpose. The foreign property liens proposed by Hynix cannot serve that purpose for two

5   reasons: their value is too uncertain and contingent, and they are too burdensome to enforce.

6

7

8

9   Rambus is not a real estate firm. It has no

10  familiarity with the commercial real estate market. What limited knowledge it has about Korea's

11  property laws it has acquired, through considerable expense, from its Korean lawyers

12

13

14

15

16

17

18  Hynix's own security proposal confirms that there is reason for both the Court and

19  Rambus to be concerned

20

21

22

23  The difficulty faced by courts and appellees in assessing the value of property

24  should give it pause in accepting it as security. In the case featured by Hynix, *Olympia*

25  *Equipment*, Judge Easterbrook explained in his concurrence why the fair and efficient approach

26  instead is to require the appellant to mortgage that property to a bank. Although, he noted, the

27  appellant "asserts that the security it has posted with the district court will assure payment," the

28  "district court cannot easily verify this claim. A bank or bonding company would do better." 786

RAMBUS'S OPPOSITION TO HYNIX'S MOTION FOR
STAY OF EXECUTION OF MONEY JUDGMENT
CASE NO. CV 00-20905 RMW

1    F.2d at 801. Because they "have the benefits of expertise and ready access to information" as

2    well as "the spur of self interest," it is "[f]ar better to have the valuation and monitoring function

3    performed by specialists that to have them performed by a district judge." *Id.*

4         Although the *Olympia* Court ultimately upheld the alternative security arrangement there,

5    the property at issue was apparently in the United States. *See* 786 F.2d at 801 (real property,

6    microwave equipment, and satellite transponders worth five times the judgment). No mention

7    was made of foreign proceedings, and *Olympia's* authorizing judge (Posner) has elsewhere

8    expressed concerns about procedural obstacles to enforcing such security. *See Lightfoot v.*

9    *Walker*, 797 F.2d 505, 507 (7th Cir. 1986). The Seventh Circuit modified the security to reach

10   the defendant's corporate parent, and mitigated the risk by accelerating the appeal. *Olympia*, 786

11   F.2d at 801. The risks identified by Judge Easterbrook in *Olympia* are present to an even greater

12   degree here. What Hynix proposes is a lien on *commercial* real estate, used for a "reeling"

13   DRAM business (Mot. at 2), in a *foreign* market, at a time of "severe" financial dislocation (*id.*).

14   Conversely, the fact-bound reasons for accepting the risks in *Olympia* do not obtain here.

15         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is also an inadequate security because the procedure for enforcing it

16   in Korea "is not only cumbersome and time-consuming, but uncertain in outcome." *Lightfoot*,

17   797 F.2d at 506. To perfect and liquidate its lien, Rambus would have to pursue a complicated,

18   multi-step administrative process. Before it would even have a valid lien, Rambus would need to

19   (1) file a report with the Bank of Korea, backed by a detailed valuation of the property, and (2)

20   register the mortgage with a Korean court. (Rhee Decl. at 2-4.) The registration process would

21   require Rambus to pay taxes. (*Id.*) If it were necessary for Rambus to execute this lien, it would

22   have to undertake a separate and even more arduous process. First, Rambus would need to file a

23   petition for an *auction* with a Korean Court, which in turn would appoint an appraiser and

24   investigator to report on the value of the property and the status of any liens. (*Id.* at 4-7.)

25   Second, the Court would need to hold one or more auctions, with progressively lower asking

26   prices, until a buyer is found. (*Id.*) Third, once the auction process yields a buyer, Rambus

27   would have to participate in a distribution process, along with other lien holders. (*Id.*) That

28   process would entail yet more taxes. (*Id.*)

1    The complex nature of the enforcement process, and the fact that it would take place

2    abroad, alone weigh against accepting Hynix's alternative arrangements.  In contrast to a

3    supersedeas bond, which is simple to enforce, *Lightfoot*, 797 F.2d at 507, the lien Hynix proposes

4    would require Rambus to incur additional costs and mire it in red tape for minimum of six months

5    (Rhee Decl. at 9).  Even then, Rambus could have no guarantee of receiving the full value of its

6    interest in the properties.  As the declaration of Rambus's Korean law expert shows, the auction

7    process typically does not yield the appraised value of mortgaged properties even in the best of

8    circumstances.  (Chung Decl. ¶¶ 6-7.)[6]

9    The Korean court will typically set an initial bidding price based upon its valuation report.

10   Because of the passage of time, that price may be considerably less than the value of the property

11   at the time the lien was recorded.  (Chung Decl. ¶¶ 6-7.)  If there are no bidders on the asking

12   price at the initial auction, the Korean court will hold a second auction, at which the minimum

13   bidding price will be reduced by 20%.  (*Id.*)  Real property is rarely sold at the initial auction.

14   (*Id.*)  When, as in this instance, the property to be auctioned is commercial real estate, the pool of

15   interested bidders is likely to be limited to companies from the same industry, making multiple

16   auctions more likely and further depressing the price of the winning bid.  (*Id.*)



23   This is not a situation, then, in which the alternative security proposed by the appellant

24   provides a means "of paying judgments without substantial delay or other difficulty."  *Dillon v.*

25   *City of Chicago*, 866 F.2d 902, 905 (7th Cir. 1988).  The proposed security instead is fraught with

26   logistical difficulties and uncertainty, requiring Rambus to gamble with *half* its judgment against

27
28   [6] Jin Yeong Chung, a lawyer licensed to practice in Korea, is Rambus's Korean law expert on
     enforcing liens.  His declaration is concurrently filed.

1    Hynix. *Cf. Lightfoot*, 797 F.2d at 507 (rejecting availability of payment by defendant where the

2    state legislature would need to vote to appropriate it).  On this score, the cases relied upon by

3    Hynix are off the mark.  In *C. Albert Sauter Co. v. Richard S. Sauter Co.*, 368 F. Supp. 501 (E.D.

4    Pa. 1973), a $1.2 million judgment was secured by an arrangement in which the defendant

5    corporation pledged *all* of its common stock, individuals pledged case and stock, and some of the

6    defendants posted a $100,000 bond.  *Id.* at 520-21.  A package of common stock, cash, and a

7    bond cannot be compared, in liquidity or transparency, to a lien on foreign commercial property.

8    And a critical aspect of the security arrangement upheld in *TWA, Inc. v. Hughes*, 515 F.2d 173,

9    177 (9th Cir. 1975), were requirements that the defendant maintain a net worth four times the

10   balance of the judgment left by the bond.  Hynix has opposed such restrictions (Mot. 12 n.9), and

11   they could give Rambus little comfort anyway, as its recourse would ultimately be to assets of

12   questionable value outside the United States.

**2.    Hynix's Alternative Security Would Unfairly Shift Risk to Rambus, Undercutting the Purpose of Rule 62**

15        Hynix should not be permitted to shift to Rambus the risk and costs ███████████

16   ███████.  Assuming these properties have economic value, Hynix should have them assessed by a

17   bank or surety and use the proceeds to provide Rambus with a reasonable security.  Financial

18   institutions are best positioned to ████████, and can bring expertise "to bear in liquidating

19   security if something should go wrong."  *Olympia*, 786 F.2d at 802 (Easterbrook, J., concurring).

20   "Banks are in the business of taking risks for a price," *id.*, and whatever fee Hynix must pay to

21   translate these assets into an acceptable security is a cost that *Hynix* should properly bear if it

22   intends to appeal.

23        If Rambus is made to take liens ████████, it will have to bear all the risks and costs

24   noted above.  Because it lacks the expertise of a financial institution, both the risks and the costs

25   of perfecting and liquidating the liens will be greater for Rambus than for a bank or surety.  *Id.*

26   ("Risk is more costly for the plaintiffs than it is for banks.").  That result would be fundamentally

27   unfair, as it would absolve Hynix of a burden it ought to bear under Rule 62.  Nor has Hynix

28   offered any indication that it would be willing to *compensate* Rambus for the risk.

1    "Letting plaintiffs bear the risk themselves, without compensation, transfers wealth from

2    the plaintiffs to the other creditors." *Id.* It also turns Rule 62 on its head, as the rule's very

3    purpose is to require appellants, as a condition of staying the judgment, to give appellees

4    reasonable assurance that they will be able to collect the judgment.  An appellant is not entitled to

5    delay enforcement of a money judgment as of right; that is "a privilege" the appellant must pay

6    for by posting a bond or giving comparable security.  *Poplar Grove*, 600 F.2d at 1191 n.1.  It also

7    "provides compensation for those injuries which can be said to be the natural and proximate result

8    of the stay." *Hamlin v. Charter Twp. Of Flint*, 181 F.R.D. 348, 351 (E.D. Mich. 1998) (citations

9    omitted).  Under Hynix's approach, however, it is the *appellee*, Rambus, that must compromise

10   its money judgment in order to permit Hynix to stay execution pending appeal.  And the only

11   apparent justification for imposing this cost on Rambus is to save the *appellant*, Hynix, the

12   expense of providing adequate security.

13       When it comes to supersedeas bonds, sauce for the goose is *not* sauce for the gander.

14   Hynix, and only Hynix, has the obligation to secure the judgment.  Because it has not offered a

15   reasonable alternative, this Court should enforce the default bond requirement.  In these

16   circumstances, applying Rule 62 would not "penalize Hynix for exercising its right to appeal."

17   (Mot. at 13.)  It follows directly from Hynix's burden under Rule 62.

18           **3.    Any Alternative to a Full Bond Should Provide Rambus With a**
               **Reliable and Readily Enforceable Security Interest**
19

20       If this Court elects to consider alternatives to a full bond, it should hold Hynix to

21   proposals that give Rambus adequate security and are simple to enforce.  *See Lightfoot*, 797 F.2d

22   at 507.  The following arrangements would satisfy these criteria and be acceptable to Rambus:

23       *Option 1:  A Bond of $250 Million or Greater, With the Balance in Letters of Credit From*

24   *Reputable American or International Banks.*

25

26

27

28

RAMBUS'S OPPOSITION TO HYNIX'S MOTION FOR
STAY OF EXECUTION OF MONEY JUDGMENT
CASE NO. CV 00-20905 RMW

1

2

3

4       The balance of the $150 million can be made up with Letters of Credit from a AA-rated

5   U.S. bank or the U.S. branch of a highly-rated international bank.  As noted, there are a number

6   of possible means by which Hynix could obtain acceptable Letters of Credit, even if it must pay

7   more.  Hynix could, for example, mortgage its fabs to banks or real estate firms and use the

8   proceeds to obtain Letters of Credit.

9       *Option 2:  Bond of $250 Million or Greater, with Balance in Cash Deposited with the

10  Court or into Escrow.*  As an alternative to Letters of Credit, Hynix could deposit the balance of

11  $150 million in cash or short-term securities with the Court or into an escrow account.  *Cf. Bolt,*

12  2005 WL 2298423, at *3 (upholding alternative security that called for the payment of money

13  into escrow).  Hynix could obtain the funds to make such a deposit by drawing on its cash (or

14  cash equivalents), credit arrangements, fabs, or some combination of these assets.

15      **C.    Hynix Should Be Required to Pay the Forward-Looking Royalties Directly to
                Rambus or, At a Minimum, Into Escrow**

16

17      Hynix's suggestion that the Court "[o]rder [a]ccrual of the [r]oyalties" (Mot. 17-19) is not

18  only legally unfounded, but also nakedly unfair to Rambus.  Like Hynix's other proposed

    methods of addressing the judgment, accrual would leave the money Rambus is owed in Korea,
19

20                                                          And because Rambus's patents have nearly

    expired, allowing Hynix to continue to infringe Rambus's patents while "accruing" royalties
21

22  would effectively treat the judgment of infringement as if it never happened.  Consistent with

    precedent and basic fairness, the Court should require Hynix to pay the ongoing royalties Rambus
23

24  directly,[7] or at least into an escrow account.

─────────────────────────

25  [7]  The Court need not, and should not, decide now whether Rambus must repay royalties if Hynix
    prevails on appeal.  (Mot. at 16.)  That issue is one to be decided after the appeal, as was done in
26  *Broadcom.*  On the merits, however, Rambus contends that *Broadcom* was wrongly decided.  It
    goes without saying that if a permanent injunction had issued here, and the parties had negotiated
27  a license pending appeal, Hynix would not be able to recover money paid pursuant to that license
    even if it prevailed on appeal.  Yet that situation is not meaningfully different from a compulsory
28  license.  Contrary to the *Broadcom* Court's reasoning, 585 F. Supp. 2d at 1189-90, the
    "compulsory" aspect of the license operates with respect to *Rambus*, which has been forced to

1        Although Hynix is correct that this Court "has the power" to permit Hynix to accrue the

2    royalties it owes Rambus, the usual course is for an ongoing infringer to pay the royalties either

3    directly to the patentholder or into an escrow account. *See Broadcom Corp. v. Qualcomm Inc.*,

4    585 F. Supp. 2d 1187, 1188 (C.D. Cal. 2008) (paid directly); *Amado v. Microsoft Corp.*, 517 F.3d

5    1353, 1356 (Fed. Cir. 2008) (escrow); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314

6    (Fed. Cir. 2007) (escrow); *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527,

7    1544-45 (Fed. Cir. 1992) (escrow). Of these two, the default position is for the infringer to pay

8    the royalties directly to the patentholder as a form of equitable relief. *Cf. Paice*, 504 F.3d at

9    1313-15. Like Hynix's "accrual" proposal, paying into escrow is a way of staying that relief, and

10   is thus an exceptional course subject to the test set forth by the Federal Circuit in *Standard*

11   *Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990). Indeed, although

12   it now argues otherwise, Hynix has historically all but conceded that *Standard Havens* applies.

13   (*See* Hynix's Statement Re: Final Judgment at 6 (noting that the Federal Circuit has ordered "an

14   escrow account for deposit of ongoing royalties during the pendency of the appeal, where an

15   injunction has been stayed pending appeal" and citing *Standard Havens*).)

16       Under the *Standard Havens* test, Hynix plainly fails to establish that it is entitled to pay

17   into escrow, let alone to accrue, the royalty payments that the Final Judgment requires be paid to

18   Rambus. As to both forms of relief, Hynix has not satisfied the two most important of the

19   *Standard Havens* factors. First, Hynix cannot make, and certainly has not made, "a strong

20   showing that [it] is likely to succeed on the merits" in its appeal. *Id.* at 512. For example, the

21   Court has already rejected Hynix's request for reconsideration of its spoliation ruling, and Hynix

22   offers no basis to conclude the Federal Circuit will have a different view. Likewise, there is a

23   strong likelihood that the Federal Circuit will uphold this Court's carefully drawn claim

24   construction, since it has already considered many of the issues Hynix is likely to raise. *See*

25

26   accept a license it otherwise might have rejected. Hynix's decision to continue manufacturing
     infringing devices is voluntary. The purpose of a compulsory license is to guarantee that an

27   infringer can continue using patented technology, not to alter the fundamental licensor/licensee
     relationship, under which money paid is the patentholder's regardless of the ultimate outcome of

28   the case.

1   *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081 (Fed. Cir. 2003).  Hynix's other likely

2   appellate arguments fare no better.

3          Second, Hynix has not shown that it will be "irreparably injured" if it were required to pay

4   Rambus directly, rather than paying into an escrow account or setting aside the money.  *Standard*

5   *Havens*, 897 F.2d at 512.  Indeed, it is hard to see what such injury would be, since in any event

6   Hynix would not be permitted to use the money.  There is nothing to suggest that Rambus would

7   be unable to repay the royalties following the appeal if so ordered (Mot. at 19), and "the potential

8   loss of the withholding tax paid to the Korean government" (*id.*) is entirely illusory:  Hynix's

9   declarations contain *no indication whatsoever* that Hynix would be unable to recover the tax; to

10  the contrary, they state that "[a]ccording to Korean national tax law, within three years after the

11  payment of the withholding tax, Hynix can request a refund."  (Sa Decl. ¶ 6.)[8]  Rambus's Korean

12  tax law expert, a former judge and Korean National Tax Service lawyer, has explained that the

13  procedure is straightforward, and that Hynix can be confident it would recover any taxes withheld

14  on payments ultimately returned to Hynix.  (Kwon Decl. ¶ 3.)  Mere administrative

15  inconvenience plainly is not irreparable harm.[9]

16         Hynix's failure to carry its burden on these points should foreclose any relief from its

17  obligation to pay Rambus directly.  But even if the Court were to conclude that payment into

18  escrow were an acceptable alternative to paying Rambus directly, under no circumstances should

19  Hynix be permitted to simply "accrue" its ongoing royalty obligations.  In addition to the

20  shortcomings it shares with the escrow approach, Hynix's proposal of accrual also fails the third

21  and fourth prongs of *Standard Havens*.

22         As for the third prong, Hynix's own insistence ███████████████████

23  ██████████ demonstrates that allowing Hynix to accrue has the potential to "substantially

24  injure" Rambus, 897 F.2d at 512.  The only case Hynix has been able to identify in which an

---

25  [8] Indeed, although the Court need not reach the issue, Rambus does not believe that the royalty
    payments would ultimately be subject to Korean tax at all because they are not Korean source
26  income.

27  [9]  The threat of lost taxes is even less plausible with respect to the escrow approach (Mot. 17)
    because escrow payments of this sort are not properly treated as a taxable event under Korean law
28  (Kwon Decl. ¶ 4), and therefore should not be subject to withholding at all.

1    ongoing infringer with a compulsory license was permitted to accrue royalties rather than pay

2    them is *Voda v. Cordis Corp.*, 2006 WL 2570614 (W.D. Okla. Sept. 5, 2006).[10]  But when its

3    facts are considered, *Voda* underscores, rather than undercuts, why Hynix cannot be allowed to

4    accrue the royalties.  In *Voda*, the plaintiff won a judgment that included ongoing royalties of

5    apparently less than $1 million a year from Cordis Corporation, a subsidiary of the medical

6    industry giant Johnson & Johnson.  *Id.* at *1, *4.  The plaintiff sought to have Cordis pay into an

7    escrow account, but Cordis opposed this motion on the basis of its sound fiscal health—noting,

8    among other things, Johnson & Johnson's $50.5 *billion* in sales.  (*See* Wu Decl., Ex. H (Cordis'

9    Opp'n to Voda's Mot. for Entry of J., July 20, 2006).)  The Court agreed, and held that Cordis

10   could accrue royalty payments because there was no question of its ability to pay the money.

11   *Voda*, 2006 WL 2570614, at * 6.  Here, the royalty payments are orders of magnitude greater than

12   they were in *Voda*, while Hynix is orders of magnitude smaller than Johnson & Johnson.  ████

13   ███████████████████████████████████████████████████████  And there is

14   every reason to think that Rambus will face difficulties collecting royalties from a foreign

15   company.  Accruing, like paying into escrow, is a way of securing the payments owed; it should

16   be permitted only if it sufficiently protects the prevailing party, which it plainly does not here.

17          Finally, the fourth *Standard Havens* factor considers the "public interest" in granting a

18   stay.  897 F.2d at 512.  It is self-evident that permitting a proven patent infringer not only to

19   continue infringing but also to pay nothing for doing so would offend, rather than promote, the

20   "public interest."  *Id.*

21          In an alternative throwaway argument, Hynix asserts that Rambus may not simultaneously

22   seek a permanent injunction on appeal *and* seek to enforce the royalty payments in the meanwhile

23   because the two courses are "inconsistent."  (Mot. at 16-17.)  Even setting aside the fact that this

24

---

25   [10] Rambus has been unable to find any other cases reaching the same result as *Voda*.  Hynix does
     cite *z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437 (E.D. Tex. 2006), for the same

26   proposition, but that case does not address accrual at all (and indeed it was cited by the plaintiff in
     *Voda* in *opposition* to defendant's request to accrue).  In *z4 Techs*, the Court simply severed the

27   claims for ongoing infringement into a separate action.  *Id.* at 444.  Here, the Court has already
     resolved the ongoing infringement issues in the Final Judgment.  (Final Judgment at 3-7.)  The

28   case offers no guidance here.

1  argument is entirely premature (since Rambus has not filed any notice of appeal), the two courses

2  are complementary, not inconsistent. Unless and until Rambus can exercise its right to exclude

3  Hynix from practicing Rambus's inventions, Rambus's only recourse is to collect royalties. Even

4  if Rambus obtains a permanent injunction on appeal, with time left on the patent to enforce it, its

5  *only* means of collecting for Hynix's infringement between now and then is the royalties

6  arrangement. The sole authority cited by Hynix, *Enserch Corp. v. Shand Morahan & Co., Inc.*,

7  918 F.2d 462, 464 (5th Cir. 1990), simply suggests that one cannot seek two overlapping forms of

8  remedy: specific performance and payment for nonperformance. But the only way that

9  compulsory royalties and a permanent injunction would be overlapping would be if Rambus were

10 somehow excluding Hynix *and* collecting royalties *during the same time frame*; such a course is

11 not only "inconsistent," but logically impossible.

## IV.   CONCLUSION

The Court should reject Hynix's motion, direct it to post a full bond in accordance with

Rule 62, and order it to pay Rambus directly for its ongoing infringement of Rambus's patents.

DATED: April 10, 2009                      MUNGER, TOLLES & OLSON LLP
                                           SIDLEY AUSTIN LLP
                                           McKOOL SMITH P.C.


                                           By:_____/s/ Gregory P. Stone_____
                                                    GREGORY P. STONE

                                           Attorneys for RAMBUS INC.

RAMBUS'S OPPOSITION TO HYNIX'S MOTION FOR
STAY OF EXECUTION OF MONEY JUDGMENT
CASE NO. CV 00-20905 RMW