1
2
3
4
5
6
7
8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10                        **SAN JOSE DIVISION**

11

12  HYNIX SEMICONDUCTOR INC., HYNIX          Case No. C-00-20905 RMW
    SEMICONDUCTOR AMERICA INC.,
13  HYNIX SEMICONDUCTOR U.K. LTD., and       FINDINGS OF FACT AND CONCLUSIONS
    HYNIX SEMICONDUCTOR                      OF LAW ON SPOLIATION AND THE
14  DEUTSCHLAND GmbH,                        UNCLEAN HANDS DEFENSE

15              Plaintiffs,

16         v.

17  RAMBUS INC.,

18              Defendant.

19

20              **I.  FEDERAL CIRCUIT'S MANDATE**

21          On May 13, 2011, the Federal Circuit issued its opinion affirming in part and vacating in part

22  this court's judgment in the subject patent case between Hynix Semiconductor Inc., Hynix

23  Semiconductor America Inc., Hynix Semiconductor U.K. Ltd, and Hynix Semiconductor

24  Deutschland GmbH (collectively "Hynix")[1] and Rambus Inc. ("Rambus").  *Hynix Semiconductor Inc.*

25  *v. Rambus Inc.*, 645 F.3d 1336 (Fed. Cir. 2011)  ("*Hynix II*").   Specifically relevant here is that the

26

27  _____

28      [1]      Hynix was referred to as "Hyundai" prior to Hyundai's merger with LG
    Semiconductor in 1999.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   Federal Circuit vacated this court's Findings of Fact and Conclusions of Law regarding spoliation

2   and remanded the case for reconsideration of the spoliation issue.  Hynix had unsuccessfully urged in

3   the district court proceedings that Rambus had spoliated evidence and that its "unclean hands"

4   warranted dismissal of its patent infringement claims.

5          The Federal Circuit remanded the case for reconsideration under the framework set forth in

6   *Micron Technology, Inc. v. Rambus Inc.,* 645 F.3d 1311 (Fed. Cir. 2011) ("*Micron II*"), a companion

7   case presenting the identical spoliation issue, and "to determine when Rambus's duty to preserve

8   documents began . . . and the appropriate sanction, if any." *Hynix II*, 465 F.3d at 1341.  The Federal

9   Circuit expressly left for this court to decide "whether the *Micron II* decision should be given any

10  preclusive effect, the correctness of [this court's] determinations on prejudice and good faith, [and]

11  the propriety of any particular sanction on this record." *Id.* at 1341 n.2.   The court now issues its

12  Findings of Fact and Conclusions of Law in response to the Federal Circuit's mandate.

## II.  PROCEDURAL HISTORY

14         Hynix's unclean hands defense to Rambus's patent infringement claims was originally tried

15  before this court on October 17 - 19 and October 24 - November 1, 2005.  The primary issues were:

16  (1) whether Rambus adopted a document retention plan in order to destroy documents in advance of

17  a planned litigation campaign against DRAM manufacturers; and (2) whether in light of any such

18  conduct, the court should dismiss Rambus's patent claims against Hynix as a sanction pursuant to the

19  equitable defense of "unclean hands."  On January 5, 2006, the court issued its Findings of Fact and

20  Conclusions of Law holding that Rambus did not spoliate documents.

21         After further proceedings in the case, the court entered final judgment on March 10, 2009 in

22  favor of Rambus.  Hynix appealed the judgment to the United States Court of Appeals for the

23  Federal Circuit.  On May 13, 2011, the Federal Circuit issued its decision in the appeal.  On the same

24  day, the Federal Circuit issued its decision in the companion case of *Micron II*.[2]

25

26         [2]      The court considers the record in this case to be the *Hynix I* spoliation trial record
27  supplemented by:  (1) evidence that was not available at the time of the trial; and (2) the factual
    records in *Micron II* and *Micron Technology, Inc. v. Rambus Inc.*, 255 F.R.D. 135 (D. Del. 2009)
28  ("*Micron I*").  The Federal Circuit found that because Rambus argued that there are no significant
    differences in the factual records of the *Hynix* and *Micron* actions, it "has waived any argument that

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    In its *Hynix II* decision, the Federal Circuit held that this court "applied too narrow a standard

2   of foreseeability" in determining when litigation became reasonably foreseeable and thus erred in its

3   consideration of the spoliation issue. *Hynix II*, 645 F.3d at 1341.  Therefore, the Federal Circuit

4   vacated this court's Final Judgment and its Findings of Fact and Conclusions of Law regarding

5   spoliation and remanded the case.

6    After the issuance of the Federal Circuit's mandate, this court held a Case Management

7   Conference on September 2, 2011, at which it ordered the parties to submit briefs listing the

8   issues to be resolved on remand, including any collateral estoppel argument, and discussing

9   whether further evidence should be taken.  Dkt. # 4051 at 28:1-16.  After those briefs were

10  submitted, the court held another Case Management Conference on October 21, 2011.  At that

11  conference, the court ordered the parties to submit briefs and proposed findings of fact and

12  conclusions of law, using the court's (vacated) January 5, 2006 findings and conclusions as a

13  starting point.  Dkt. # 4078 at 29:14-17.  The court indicated that it would allow Hynix to propose

14  additional findings based upon evidence from other proceedings for consideration in connection with

15  Hynix's request for supplementation of the record.  *Id.* at 30:4-8.  The court also stated its tentative

16  view that collateral estoppel should not be applied but indicated that it would reexamine the issue.

17  The court directed Hynix to include in its proposed findings any assertion that collateral estoppel

18  does apply so that the issue would be, at a minimum, preserved.  *Id.* at 33:3-13.  As discussed below,

19  the court has reconsidered its tentative view and now concludes that collateral estoppel does apply to

20  the issue of Rambus's spoliation.

### III.  FINDINGS OF FACT

**A.    The Current Litigation**

23    1.    On August 29, 2000, Hynix filed a complaint, later amended, against Rambus that in

24  part sought a declaratory judgment of non-infringement, invalidity, and unenforceability of eleven

25  Rambus patents.  On February 5, 2001, Rambus filed counterclaims asserting that Hynix infringed

the different records justify different outcomes." *Hynix II*, 465 F.3d at 1342 n.1.  The court has not
considered other evidence that was not considered in the *Hynix I* spoliation trial.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

3

1  those eleven patents.  Hynix answered the counterclaims and asserted various defenses.  Rambus

2  subsequently amended its counterclaims to add four additional patents.

3      2.     The patents that have been asserted by Rambus in this case and their issue dates are

4  set out in the following table:

| Patent | Issue Date | Title |
|---|---|---|
| 5,915,105 | 6/22/99 | Integrated circuit I/O using a high performance bus interface |
| 5,953,263 | 9/14/99 | Synchronous memory device having a programmable register and method of controlling same |
| 5,954,804 | 9/21/99 | Synchronous memory device having an internal register |
| 5,995,443 | 11/30/99 | Synchronous memory device |
| 6,032,214 | 2/29/00 | Method of operating a synchronous memory device having a variable data output length |
| 6,032,215 | 2/29/00 | Synchronous memory device utilizing two external clocks |
| 6,034,918 | 3/7/00 | Method of operating a memory having a variable data output length and a programmable register |
| 6,035,365 | 3/7/00 | Dual clocked synchronous memory device having a delay time register and method of operating same |
| 6,038,195 | 3/14/00 | Synchronous memory device having a delay time register and method of operating same |
| 6,067,592 | 5/23/00 | System having a synchronous memory device |
| 6,101,152 | 8/8/00 | Method of operating a synchronous memory device |
| 6,324,120 | 11/27/01 | Memory device having a variable data output length |
| 6,378,020 | 4/23/02 | System having double data transfer rate and integrated circuit therefor |
| 6,426,916 | 7/30/02 | Memory device having a variable data output length and a programmable register |
| 6,452,863 | 9/17/02 | Method of operating a memory device having a variable data input length |

3      3.     All of the patents-in-suit are continuation or divisional applications based on a single

parent application, serial number 07/510,898 ("'898 application").

4      4.     In January 2005, Hynix moved for leave to add the defense of "unclean hands" to its

pleadings.  In an order dated March 7, 2005, this court granted that motion.  In a separate order of the

same date, the court stated that Hynix's unclean hands allegations would be considered by the court

in a separate, initial phase of the trial of the parties' respective claims.

5      5.     The court held a bench trial on Hynix's defense of unclean hands from October 17,

2005 through November 1, 2005, and issued its Findings of Fact and Conclusions of Law on January

5, 2006.  The court concluded that Rambus had not spoliated evidence, that Rambus had not acted in

bad faith in destroying evidence, and that Hynix had not been prejudiced by the destruction of

1  relevant evidence.  *See generally, Hynix Semiconductor Inc. v. Rambus Inc.*, 591 F. Supp. 2d 1038

2  (N.D. Cal. 2006) ("*Hynix I*").  After further proceedings, including trial of Rambus's allegations that

3  Hynix infringed certain claims of the patents-at-issue and Hynix's claims and defenses based upon

4  theories including monopolization and other misconduct, judgment was entered on March 10, 2009

5  in favor of Rambus.  Hynix appealed.

6        6.      On May 13, 2011 the Federal Circuit issued its opinion affirming in part,

7  vacating in part (specifically, this court's Findings of Fact and Conclusions of Law regarding

8  spoliation), and remanding the spoliation issue for reconsideration under the framework set forth in

9  *Micron II.  Hynix II,* 465 F.3d at 1341.

10       **B.      The Farmwald/Horowitz Patent Applications**

11       7.      Rambus was founded in March 1990 by two professors, Michael Farmwald, PhD, and

12  Mark Horowitz, PhD, who had been working together to address the increasing gap between

13  microprocessor performance and dynamic random access memory ("DRAM") performance.  Trial

14  Transcript ("Trial Tr.") 600:13-601:5; 1341:15-1343:2; 1540:12-19; HTX[3] 005.001.

15       8.      From 1990 to the start of 2005, Geoffrey Tate was the Chief Executive Officer of

16  Rambus.  At the time of the trial of the spoliation phase, Tate was the Chairman of the Board at

17  Rambus.  Trial Tr. 1226:9-16.

18       9.      On April 18, 1990, Farmwald and Horowitz filed the '898 application.  Trial Tr.

19  364:11-365:19; 600:20-601:8; HTX 005.001.

20       10.     The '898 application resulted in a number of continuation and divisional patent

21  applications ("Farmwald/Horowitz family").  Rambus received its first issued United States patent

22  resulting from the '898 application in September 1993.  The patents that are at issue in this case

23  resulted from this continuation and divisional process.  HTX 005.001.

24       11.     Rambus retained Blakely, Sokoloff, Taylor & Zafman ("BSTZ") as outside patent

25  counsel from approximately 1991 through sometime in 2001 or 2002 to prosecute Rambus patent

26  applications, including many applications from the Farmwald/Horowitz family.  Trial Tr. 784:14-

27

28        [3]       "HTX___" refers to Hynix's trial exhibit number ___; "RTX___" refers to Rambus's
     trial exhibit number ___.

785:2.  Lester Vincent, Scott Griffin, and Roland Cortes were patent prosecutors at BSTZ who worked on the Farmwald/Horowitz family of applications. Trial Tr. 784:14-785:2; 1592:22-1593:9; 1603:14-1604:11.

12 .    The first of the patents that Rambus has asserted against Hynix in this action issued on June 22, 1999. Dkt. # 249, at 17-19.

**C.    Rambus's RDRAM Technology**

13.    Rambus does not manufacture its own products; rather, it licenses its intellectual property to DRAM manufacturers and collects royalties.  Trial Tr. 1250:25-1251:2.  As a company that generates revenue from its intellectual property alone, intellectual property protection necessarily is important to Rambus.

14.    In 1996, Intel licensed the Rambus Dynamic Random Access Memory ("RDRAM") technology and adopted it as the memory interface technology for its next generation microprocessors.  *Micron II,* 645 F.3d at 1316; Trial Tr. 1237:20-1239:1.  Because Rambus does not manufacture products, it relied upon DRAM manufacturers to license Rambus's intellectual property and produce RDRAM for use in Intel's products.  Trial Tr. 1251:3-6.  Rambus negotiated licenses with a number of DRAM manufacturers to produce RDRAM-compliant chips for Intel's use.  *Micron II,* 645 F.3d at 1316; Trial Tr. 1237:20-1239:1.  In April 1998, Tate met with Intel and learned that Intel's intent was to compete with Rambus's RDRAM for its next generation of product:  "'[I]ntel says they are basically going to compete with us on [the] next generation [of DRAM].'"  *Hynix II* at 1343. By the fall of 1999, Rambus's licensed RDRAM manufacturers had failed to deliver the promised manufacturing capacity, which contributed to Intel's rethinking of its adoption of RDRAM. *Micron II*, 645 F.3d at 1316.

15.    Rambus referred to the RDRAM production by licensed DRAM manufacturers as the "Direct RDRAM ramp."  Trial Tr. 1238:4-8; 1330:21-24.  Direct RDRAM licensees were granted a narrow license to produce RDRAM.  Trial Tr. 1289:1-16.  Those licenses generally did not permit licensees to utilize Rambus intellectual property for purposes other than producing RDRAM pursuant to Rambus's specifications.  Other uses of Rambus's technology were referred to as "non-compatible" uses, because they were non-compatible with the RDRAM specifications.  Trial Tr.

1   1356:22-1359:24.

2        **D.   Rambus's Participation in JEDEC**

3        16.   Rambus was a member of the Joint Electron Device Engineering Council ("JEDEC"),

4   a standard setting organization, from 1992 until it formally resigned in June 1996.  A Rambus

5   representative last attended a JEDEC meeting in December 1995.  Trial Tr. 786:21-795:8; 1148:11-

6   12; 1161:12-20; *see also Hynix II*, 645 F.3d at 1341-2.

7        17.   Richard Crisp, a program manager for Rambus, was Rambus's primary representative

8   to JEDEC and attended JEDEC meetings on behalf of Rambus from 1992 to late 1995.  Trial Tr.

9   1148:8-11.  Billy Garrett was Rambus's other JEDEC representative.  RTX 311; RTX 312.

10       18.   Crisp and Garrett submitted trip reports following each meeting of JEDEC that they

11  attended.  Crisp took a Macintosh laptop computer with him and took notes electronically.  He later

12  distributed his JEDEC trip reports to members of the Rambus executive team and others in the sales

13  division.  After Crisp heard presentations on features to be included in the standard at JEDEC, he

14  discussed the inventions with the attorneys prosecuting Rambus's patents, signaling them to direct

15  Rambus's prosecution efforts to cover those features.  *Hynix II*, 645 F.3d at 1342.  During Rambus's

16  membership, JEDEC adopted Synchronous Dynamic Random Access Memory ("SDRAM") as a

17  standard and by December 1996 was working on DDR SDRAM.  *Id.*

18       19.   Between 1992 and late 1995 or early 1996, Crisp, Tate, Tony Diepenbrock (inside

19  patent counsel) and other Rambus executives and employees were informed that Rambus's

20  participation in JEDEC might pose enforcement problems for some of its patents.  Specifically, the

21  concern was raised that Rambus might be equitably estopped from enforcing its patents as a result of

22  its failure to disclose to JEDEC Rambus's potential patent coverage with respect to products (non-

23  compatible with RDRAM) conforming to JEDEC standards.  Trial Tr. 1156:4-1163:22; HTX 066;

24  HTX 078; HTX 225.  Rambus was also informed of this possibility by Vincent, one of its outside

25  patent attorneys.  Trial Tr. 785:3-804:7; HTX 192.  This concern was discussed within Rambus.  *Id.*

26       20.   Although Rambus's executives and attorneys had concerns about equitable estoppel,

27  no duty to disclose existed because the Rambus patent applications that were pending during

28  Rambus's participation in JEDEC did not read on the adopted standard.  *See Hynix II,* 465 F.3d at

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1349; *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1101-04 (Fed. Cir. 2003). The JEDEC disclosure duty applied only to issued patents and pending patent applications. *See Hynix II*, 645 F.3d at 1348-49; *Infineon*, 318 F.3d at 1102. Crisp nonetheless did disclose Rambus's U.S. Patent No. 5,243,703 to JEDEC in September 1993; the specification of the '703 Patent is substantially the same as the specification of the patents-in-suit -- only the claims are different. *See id.*

**E.   MoSys License**

21.   In 1996, Rambus initiated patent licensing negotiations with Mosys. Mosys had been founded by two former Rambus engineers and, according to Rambus, the Mosys product shared many characteristics with Rambus's products. Trial Tr. 1382:13-1384:17. Rambus wanted to "avoid any legal battle with Mosys" because litigation would have been disruptive, expensive, and likely unnecessary; Rambus expected to "beat them in the marketplace regardless." Trial Tr. 1384:5-15.

22.   Patent negotiations, which Tate stated Rambus was poorly equipped to handle (Trial Tr. 1385:13-16) nevertheless resulted in MoSys taking a license from Rambus. However, Tate determined that since patent licensing negotiations were more complex than Rambus had originally thought, Rambus needed to hire someone familiar with the negotiation of patent licenses to handle future licensing negotiations. Trial Tr. 1385:17-24.

**F.   Rambus's Relationship with Hynix**

23.   Rambus and Hynix (then Hyundai) had a licensing agreement commencing in 1995 for RDRAM. The agreement included an "Other DRAM" provision that allowed Hynix to make non-compatible DRAMs using Rambus Interface Technology in return for a 2.5% royalty. Trial Tr. 1295:19-1305:11; HTX 004.004; HTX 087; HTX098.002.

24.   In July 1998, Rambus attempted to remove or amend the "Other DRAM" provision. *Id.* It appears that Rambus wanted Hynix (Hyundai) to increase its marketing effort and to productize the RDRAM device, and that Rambus wanted to be able to claim infringement if Hynix (Hyundai) continued to work on Synchronous Link DRAM ("SLDRAM") or SDRAM. *Id.*; Trial Tr. 1038:2-1039:22.

25.   Thereafter, Hyundai merged with LG Semiconductor ("LGS"). At the time of the merger, both Hyundai and LGS had RDRAM licenses with Rambus. *Id.* Following the merger, the

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  resulting entity, Hynix, sought to affirm the 1995 Hyundai-Rambus license, asking Rambus to agree

2  to use the 2.5% royalty rate specified in that license.  *Id.*

3      26.     Rambus apparently declined, instead treating its relationship with the merged

4  company, Hynix, as being governed the LGS license, which apparently did not have an "other

5  DRAM provision."  Trial Tr. 1038:2-1039:22.

6      **G.     Rambus Formulates its Licensing and Litigation Strategy**

7          **1.     Rambus Hires Joel Karp**

8      27.     Rambus hired Joel Karp in October 1997 to assess its patent portfolio, determine if

9  chips infringed the patent portfolio, develop licensing strategies for infringing chips, and negotiate

10 with companies that built and sold such chips.  Trial Tr. at 356:22-357:23; RTX 080; HTX 091.

11 Before Karp started work, Tate sent an e-mail to Rambus executives describing Karp's role as "to

12 prepare and then to negotiate to license our patents for infringing drams (and potentially other

13 infringing ic's)."  HTX 091; RTX 080.  For some time prior to Karp's employment, Rambus was

14 concerned that companies in the DRAM field were infringing Rambus's patents or using Rambus's

15 inventions in non-compatible chips.  Rambus did not want to disclose its concern because it was not

16 sure it could show infringement.  It wanted to get more patents in place and it did not want to

17 alienate companies it needed to work with to make a success of RDRAM.  Trial Tr. 1256:18-

18 1257:12; 1390:18-1391:4; 1391:8-12; 1392:2-11.  At the time that Karp was hired, Tate had told him

19 that he wanted any party negotiating for a license from Rambus to pay more for a license for non-

20 compatible uses than one for use of the RDRAM technology.  HTX 091.

21     28.     Before his employment at Rambus, Karp was employed by Samsung from September

22 1990 through July 1997.  When he left Samsung's employment, he was a senior vice president.

23 During his employment with Samsung, Karp attended JEDEC meetings on Samsung's behalf,

24 describing his role as "Samsung's mouthpiece."  Karp met Crisp, Rambus's JEDEC representative, at

25 JEDEC meetings.  Trial Tr. 136:16-25.

26     29.     Karp had learned through his experience that the DRAM industry was very litigious.

27 Trial Tr. 138:23-134:3.

28     30.     While at Samsung, Karp participated in licensing and litigation activities on behalf of

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    Samsung.  Trial Tr. 137:6-23; 138:2-5.  He was involved with patent litigation against Mitsubishi,

2    Fujitsu, Fortel, SEL, Hitachi, Harris and Texas Instruments.  Trial Tr. 138:6-22.  In one action

3    against Texas Instruments ("TI"), Karp submitted a declaration asserting that TI was subject to

4    equitable estoppel because it was contrary to industry practice for an intellectual property owner to

5    remain silent during the standard setting practice if its intellectual property covered the standard

6    being considered.  Trial Tr. 150:12-151:7.

7           31.     In a document entitled "TOP LEVEL KEY RESULTS FOR 1998 - FINAL 1/98" Tate

8    listed twenty-seven line items.  HTX 094.  The focus was on making RDRAM successful.  *Id.*

9    Under the heading "SUCCESSFUL PRODUCT/PROJECT COMPLETION AND

10   PLANNING/TRACKING PROCESS," which was at the top of the page, Tate's first three goals were

11   "Concurrent RDRAM 600 MHZ MP:18M early 98; 64M ES Q2, MP as needed," "Direct Rambus

12   1.0 memory system implemented on spec., on cost, on schedule for production ramp late 98," and

13   "Deliver RACs in spec when customer needs with a profit on implementation fees . . . ."  *Id.*

14          32.     Under the heading "POSITION RAMBUS FOR THE FUTURE INCLUDING IP,"

15   Tate included:

16              Develop and enforce IP
                    A.  Get access time register patent issued that reads on existing
17              SDRAM
                    B.  Broad patents in place for Direct Rambus, next generation
18          signaling; and chip-to-chip interconnect
                    C.  Get all infringers to license our IP with royalties > RDRAM
19                  (if it is a broad license) OR sue.

20   *Id.*

21          33.     On January 7, 1998, Tate met one-on-one with Karp.  Tate directed Karp to prepare a

22   plan for licensing infringing DRAMs for presentation to the Rambus Board of Directors in early

23   March.  That strategy was to include a litigation strategy.  Trial Tr. 170:2-171:12; HTX 013.020; *see*

24   *also* HTX 395.002.

25                        **2.     Rambus Meets With Cooley Godward Attorneys**

26          34.     In late 1997, Karp called Diane Savage, an attorney at the law firm of Cooley

27   Godward ("Cooley") with whom he had worked before coming to Rambus, seeking a

28   recommendation for someone to help set up a licensing program.  Trial Tr. 393:22-394:10.  Attorney

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    Savage, who was a partner in Cooley's technology transactions group, introduced Karp to her

2    colleagues John Girvin, Dan Johnson, and Peter Leal.  Trial Tr. at 394:17-22; 585:16-19. They were

3    litigators but also did licensing.  Trial Tr. 586:9-10.  Leal, a licensing attorney, reported to Girvin,

4    head of the Information Technology Patent group.  Trial Tr. 586:9-16.  Girvin, in turn, reported to

5    Johnson, head of Cooley's litigation group.  *Id.*  Karp dealt extensively with Johnson.  Trial Tr.

6    395:6-10.8-10.  When asked why he had in mind forming a licensing team with a litigator, he

7    explained: "Again, from my experience at Samsung, many times when people came out for licensing

8    discussions, there was kind of a litigator in the room, sort of an elephant in the corner."  Trial Tr.

9    395:11-19.

10           35.     On January 13, 1998, Tate and Karp met with Cooley attorney Leal, who specialized

11   in licensing matters.  On January 15, 1998 Karp and Leal met again.  HTX 376.  Leal's notes of the

12   January 13, 1998 meeting reflect that the parties discussed the concept "[n]o negotiation w/out full

13   strategy and prep."  HTX 395.001.  Rambus wanted to "go in and quickly proceed to either a license

14   or litigation."  *Id.*  Further, Rambus was "looking for a royalty rate that tells [the DRAM industry] it

15   costs to infringe."  *Id.*  Rambus wanted to "[t]ry win-win first; do not prejudice g[ood] - f[aith] for

16   litigation."  *Id.*  Tate and Karp told Leal they "[w]ant <u>litigation strategy by March board meeting</u>.  Six

17   weeks from now."  HTX 395.002.  At the January 15, 1998 meeting, Karp and Leal discussed a

18   proposed sequence for negotiating meetings with potential infringers, including roles Rambus

19   executives and Cooley attorneys might play in negotiations and what information would be presented

20   at each meeting, labeled in Leal's notes as the "Middle Ground, delaying meeting" and the "Pound

21   Sand" meeting.  HTX 376.001-376.004.  Rambus at this time was "very, very sensitive" to costs.

22   HTX 376.001.  Leal noted that Cooley had a list of Rambus's patents including two key patents:

23   "'481 (clear infringement if licensee uses DLL)" and "'327 (strong suspicion of infringement but need

24   hardware to be sure)."  *Id.*

25           36.     On February 12, 1998, Karp met with Johnson, Girvin, and Leal.  HTX 403.  The

26   purpose of the February 12, 1998 meeting was to develop the licensing and litigation strategy Tate

27   had requested at the one-on-one meeting between him and Karp.  HTX 097; HTX 403.  The

28   licensing strategy envisioned optimizing Rambus's notice to potential infringers, a negotiation

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  strategy and a litigation strategy.  HTX 403.

2          37.     As of the February 12, 1998 meeting, the Cooley attorneys were aware of Karp's draft

3  licensing term sheet, which specified that Rambus would charge a 5% running royalty for a license to

4  make non-compatible DRAMs.  RTX 088.  Johnson thought that insistence on such a rate would

5  inevitably lead to litigation.  Karp acknowledged that such royalty rates "will probably push us into

6  litigation quickly."  HTX 097.  Leal made a note that Rambus felt a need to litigate against someone

7  to establish a royalty rate and have a court declare a patent valid.  Johnson indicated that a breach of

8  contract claim against a licensee would be much easier to prove than patent infringement.  No

9  evidence was offered showing that Rambus ever sought the 5% royalty rate referenced in Leal's notes

10 of the February 12 meeting.

11         38.     At the February 12, 1998 meeting, Johnson expressed concern that Rambus did not

12 have a document control system in place and advised that Rambus needed to "make [itself] battle

13 ready."[4]

14         Q Do you recall somebody saying words to that effect at this meeting?

15         A That sounds like something I would do.

16         Q And what did you mean by that phrase?

17         A Very simply, Rambus was essentially an old start-up, as far as I was concerned.  It
          had been around probably eight, nine years.  They had, as best I could tell, no central
18        document patrol (*sic*) system in place, and I had not too long before this litigated a
          spoliation of evidence case and I said you guys really need, if you want to have a
19        licensing program, if you end up filing lawsuits against anybody, putting in place a
          system that gets your documents organized.
20
          * * *
21
                  They had databases, the best I could tell, that went back eight, nine years, and
22        that's an enanthema (*sic*) if you ever get a subpoena from a third party and they want
          you to go back and search documents for five years prior.
23
          Q Why did you say it's an enanthema (*sic*)?
24
          A Very simple, because it's amazing as we sit here in 2005 talking about electronic
25        discovery.

26

27         ────────────────
           [4]      Johnson apparently testified in *Micron I* that he did not use the term "battle ready."
28 *Micron Technology, Inc. v. Rambus Inc.*, 255 F.R.D. 135, 140 n.15 (D. Del. 2009).  The term was
   attributed to Karp.  *Id.*

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

But the first time these electronic discovery issues came up was back in the mid to late 90's because many clients . . . had tapes that they stored and oftentimes these tapes had different operating systems, they used old or obsolete computer systems, and more importantly, they didn't store them very well.

So you could find yourself with a bunch of data that you could not recreate because you did not have a system in place that allowed you to do it. You simply had a lot of tapes.

So I went on . . . for awhile about your (*sic*) going to spend a ton of money just trying to respond to a subpoena if you don't put in place a document retention system.

Q And . . . if you look at the rest of that bullet point, it says, "start gathering critical documents in company so we can start putting together an electronic database."

Is that something you think you said at this meeting or someone else would have said?

A I did. . . . When I knew they were on tape, I said, you know it would be a lot smarter if you put together an electronic database where you had all your documents in a form that was searchable and readily accessible.

Q And then the last sentence in this bullet point says "need company policy on document retention policy."

Do you see that?

A Correct

Q Is that something you said at this meeting?

A Absolutely.

Trial Tr. 1675:21-1678:7.

39.     Johnson advised Rambus to adopt a company policy on document retention. HTX 097. Johnson's advice regarding document retention was commonplace and similar to advice he gave to other start-up companies in the Silicon Valley. Trial Tr. 1678:21-1679:9.

40.     At this February 12, 1998 meeting, Johnson also advised Rambus to instruct its patent prosecution attorneys to clean up their files for issued patents to ensure that the Rambus file was the same as the official file, a recommendation that Johnson characterized as "standard advice." Trial Tr. 409:18-410:1; 1679:10-1680:3; HTX 097.

41.     On February 23, 1998, Cooley presented its "Proposed Strategy for Rambus." HTX 098. The document briefly outlines a licensing strategy, starting with criteria for selecting initial targets for negotiation. The proposed strategy progresses to a discussion of a tiered litigation

1   strategy.  One of the basic assumptions is that Rambus would not initiate action until a competing

2   product entered the market, at which time Rambus would conduct reverse engineering and determine

3   what action to take next.  HTX 098.002.

4          42.    Cooley's proposed strategy offered several options:  first, pursuing a breach of

5   contract remedy against existing licensees; second, initiating a patent infringement suit against an

6   unlicensed competitor; third, bringing an action against SLDRAM.  With respect to possible

7   litigation, the proposed strategy memo states:

>           To implement the above strategy, Rambus has authorized outside counsel to begin
>           organizing documents and preparing a discovery data base, so that if and when
>           Rambus elects to proceed with litigation, it will not unduly disrupt the company's
>           activities.  More importantly, with proper planning, Rambus may be able to obtain an
>           advantage over its competitors by choosing a court such as the eastern district of
>           Virginia, "the rocket docket" or the ITC.  Because these courts proceed at an
>           accelerated schedule, early preparation will benefit Rambus.

12  HTX 098.002-003.

13         43.    The Cooley document does not specifically mention establishing a document

14  retention policy at Rambus.  The Cooley proposed strategy for Rambus ends by stating that, "it bears

15  emphasis that each of the above scenarios is dependent on the facts that exist at the time the decision

16  to litigate is made.  Factors unknown at this time may result in a change of strategy."  HTX 098.003.

17  Karp added in handwriting "document retention policy" and "patent attorney files" after the text of

18  the proposed strategy.  These handwritten additions suggest that Karp was considering

19  implementation of a document retention plan that included the disposal of materials from Rambus's

20  patent prosecution files that were not contained in the files of the Patent and Trademark Office

21  ("PTO").  Karp, however, apparently did nothing to actually gather documents or begin a document

22  retention program at that time.

23         44.    On February 25, 1998, Karp had a regular one-on-one meeting with Tate at which

24  they reviewed the developing licensing and litigation strategy.  HTX 013.034.

25              **3.    Karp Presents a Licensing and Litigation Strategy to the Board**

26         45.    On March 4, 1998, Karp presented the licensing and litigation strategy at a regular

27  Rambus Board of Directors meeting chaired by Tate.  HTX 031.  The strategy included demanding

28  the 5% running royalty rate and other financial terms that Karp had reviewed with Cooley at the

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   February 12, 1998 meeting.  HTX 006.001.

2          46.    The minutes following the March 4, 1998 board meeting memorialize that the

3   meeting included an update by Karp of "the Company's strategic licensing and litigation strategy."

4   HTX 031.002.  An option under consideration was to reward licensees whose output of RDRAM

5   exceeded fifty percent of their total output for two consecutive quarters by reducing their running

6   royalty rate and to penalize those whose production was less than fifty percent for two consecutive

7   quarters by increasing their running royalty rate.  HTX 006.002.

8          47.    In the presentation, Karp recommended that "[i]f licensing discussions do not result in

9   resolution, tiered litigation strategy kicks in."  HTX 006.003.  He suggested that the first targets for

10  licensing non-compatible uses should be "present licensees which currently have released non-

11  compatible product," and that the second group of targets should be "present licensees which are

12  currently well along with alternate development."  HTX 006.006.  This presentation was based upon

13  the strategy that Cooley had presented on February 12, 1998.  Trial Tr. 418:19-419:4.

14  Several current licensees, including Hyundai, were given as examples of possible defendants in a

15  breach of contract or patent infringement suit.  HTX 006.004.  However, the discussion of the

16  possibility of litigation appears to have been only in general, somewhat speculative terms at this time

17  notwithstanding the fact that a timetable was mentioned.

18         48.    The timetable for executing the proposed licensing and litigation strategy called for

19  Rambus "not [to] contact potential licensees until D-RDRAM achieves initial samples."  HTX

20  006.007.  The first step thereafter was the delivery of initial samples of Direct RDRAM ("D-

21  RDRAM").  This was to ensure that DRAM manufacturers would be locked into the RDRAM ramp.

22  *Id.*  Thereafter, the strategy included procuring customer sample ("CS") quality parts of potentially

23  infringing devices, reverse engineering the products and creating claim charts, notifying the potential

24  infringer, conducting two meetings, and if the meetings did not result in agreement on a license,

25  commencing legal action.  The timetable projected 4-6 months from procuring "CS quality parts" to

26  the commencement of litigation.  *Id.*

27         49.    The Licensing and Litigation Strategy was apparently neither approved nor rejected

28  by the Board at the March 4, 1998 meeting.  Rambus was not planning on contacting potential

1    licensees until its RDRAM "achieve[d] initial samples." *Id.* Rambus's anticipation was that the D-

2    RDRAM would not be ready for high volume production until late 1998. HTX 094 (Item 2: "Direct

3    Rambus 1.0 memory system implemented on spec, on cost, on schedule for production ramp late

4    98"); Trial Tr. 1250:1-11.

5        50.    The Licensing and Litigation Strategy included near term actions of creating a

6    document retention policy, preparing a discovery database and conforming Rambus's attorneys' files

7    on issued patents to that which was in the PTO files. This was part of getting "battle ready." Trial

8    Tr. 206:9-207:10; HTX 006.008.

9        51.    In April 1998, Tate met with an Intel executive and was told that Intel was "basically

10   going to compete with us on [the] next generation [of DRAM]." *Hynix II*, 645 F.3d at 1343.

11       52.    In the summer of 1998, attorney Neil Steinberg worked on a small assignment for

12   Rambus. He began working again for Rambus in mid-August 1998 and he continued until April

13   1999 at which time he became Rambus's General Patent Counsel. Trial Tr. 1443:2-1444:20.

14   Starting in October 1998, Steinberg's work included prosecuting continuation applications for the

15   Farmwald/Horowitz family of patents. Trial Tr. 1463:7-1464:13.

16       53.    On July 10, 1998, Tate sent an internal e-mail to both Karp and Allen Roberts, a

17   Rambus vice-president, regarding the license agreement between Hyundai and Rambus, suggesting

18   that Hyundai would be "a great company to start Joel's plan with in q1/99 potentially" if Rambus's

19   patent application covering use of an access time register issued. HTX 087. Rambus wanted to

20   renegotiate or eliminate the "Other DRAM" provision in its existing contract with Hyundai. *Id.*

21                   **4.    Rambus Revises its Strategy**

22       54.    In late 1998, Rambus revised its approach toward licensing its technology for non-

23   compatible product to its existing licensees. Rambus initially planned to begin its licensing strategy

24   only after DRAM manufacturers were locked in to RDRAM production. This assumed that Rambus

25   would be able to procure customer samples, reverse engineer them and show potential infringement.

26   However, as of October 1998, the projected time frame for the lock-in to RDRAM was early 2000 at

27   the soonest. In an October 1998 Strategy Update, Karp projected that Rambus might be able to

28   demonstrate that Mosel and Nanya had SDRAM products that directly infringed a pending access

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  time register patent by the first quarter of 1999, thus enabling Rambus to potentially state

2  contributory infringement and inducement claims against companies like Acer, SIS, and VIA for

3  SDRAM and double data rate ("DDR") SDRAM.  However, his presentation recommended not even

4  initiating licensing negotiations.

5  ■ DO NOT ROCK THE DIRECT BOAT.
       ■ We should not assert patents against Direct partners until ramp reaches a
6       point of no return (TBD)
              ■ Probably not until Q1'00
7
   * * *
8
   ■ However, the Big Question Is - WHAT'S THE RUSH?
9         ■ What is the compelling business reason?  I can't think of any.
              ■ Keeping the Maytag repairman busy is not a valid reason
10        ■ IMHO, risks of damaging establishment of dominant standard outweigh
          potential return
11        ■ Lets not snatch defeat from the jaws of victory

12  HTX 128.003; Trial Tr. 1319:17-1321:5; 282:20-284:2.  This "point of no return" was projected to

13  be in the first quarter of 2000.  *Id.*

14        55.   Karp explained that there were good business reasons for the delay in bringing suit,

15  particularly Rambus's interest in getting licensing revenues from RDRAM manufacturers, who

16  would be the same parties it would seek to license for the production of SDRAM.  Trial Tr.

17  428:12-22; *see also Micron II,* 645 F.3d at 1317.

18        56.   Karp's October 1998 Strategy Update stated that Rambus's "Top Priority Should Be

19  Strengthening of Portfolio" by obtaining patents covering SDRAM, DDR, SLDRAM, any and all

20  forms of synchronous memory (static and dynamic) by aggressively prosecuting patent applications

21  for such coverage.  HTX 128.005.  To that end, Rambus pulled five cases from its outside patent

22  prosecution lawyers BSTZ and assigned them to its inside patent counsel attorney Steinberg.

23        57.   Karp's October 1998 Strategy Update reported that Rambus had engaged

24  Semiconductor Insights to do reverse engineering on Samsung DDR part at an estimated cost of $45

25  to $55 thousand.  HTX 128.002; HTX 129.004; Trial Tr. 289:20-25.

26        58.   Although strengthening Rambus's strategic portfolio was a top priority for Rambus

27  as of the October 1998 time frame, Rambus's ultimate goal was to make RDRAM successful and that

28  was Rambus's primary focus.  Trial Tr. 1320:5-6; *see* Trial Tr. 1321:25-1322:1; Trial Tr. 1566:24-

1567:10.  Karp and Roberts, then a Rambus vice-president, were concerned that pursuing non-compatible licensing at that time could be harmful to Rambus and alienate Rambus's RDRAM "partners" who were the ones producing non-compatible product.  Trial Tr. 1565:11-1565:24; 1567:10; *see* Trial Tr. 1321:20-1321:1.  However, meeting notes from a November 1998 offsite strategy meeting reflect that Rambus planned to assert its patents against SDRAM at some point even if its strategy to make RDRAM successful worked.  *See Micron II*, 645 F.3d at 1317.

59.     In December 1998 or January 1999, Karp drafted and distributed to Rambus executives a "Nuclear Winter Scenario" memorandum relating to Rambus's Patent Enforcement strategy for 1999.  That memo set forth an assumption in which Intel suddenly opted to move away from Rambus's RDRAM technology and instead implemented something else, for example DDR or SLDRAM.  Although Karp described the assumption as "a very unlikely scenario," he believed that if it were to happen, it would "threaten[ ]" Rambus's "very existence."  HTX 004.002.  Karp, therefore, set forth a strategy for convincing Intel "that without access to Rambus's IP, it will be difficult and costly to continue selling its current processor based products and its new, more advanced products because the memory needed for these Intel products require use of Rambus's IP."  *Id.*

60.     The Nuclear Winter Scenario memorandum set forth negotiating tactics by which Rambus hoped to establish its intellectual property position.  Rambus needed to show by clear and convincing evidence that three of Rambus's then-issued patents covered alternate competing devices: the '327 patent covered DDR (dual edged clocking); the '481 patent covered DDR (phase locked loop circuitry); and the '580 patent covered DDR and PC100 (access time register).  HTX 004.002.  The '327 patent had issued to Rambus on April 30, 1996; the '481 patent had issued on August 12, 1997; and the '580 patent had issued on November 24, 1998.  *Micron Technology, Inc. v. Rambus Inc.*, 255 F.R.D. 135, 138, 143 (D. Del. 2009) ("*Micron I*").

61.     The Nuclear Winter Scenario memorandum discussed "COMPLAINTS AGAINST DRAM COMPANIES."  HTX 004.004.  This discussion suggested potential causes of action against DRAM companies, potential litigation targets, possible venues, other necessary litigation preparation, and a cost estimate of $1.5 to $3.0 million.  In a section entitled "NEGOTIATION

TACTICS," the memorandum suggested holding meetings at which Rambus would show its claim charts to the target companies to show infringement.  HTX 004.004-004.005.  Much of the information concerning litigation was provided by Cooley attorney Johnson.  Trial Tr. 516:23-518:18; 103:14-1704:5.  Johnson also drafted the sample letter for notifying a DRAM manufacturer of infringement and offering to license, which was attached to the Nuclear Winter Scenario memorandum.  Trial Tr. 516:23-518:18.

62.     In the late 1998 to early 1999 time frame, Rambus had very limited information about DDR parts.  HTX 004.005.  Karp did not believe that Rambus had strong claims based upon the '327, '481 or the '580 patents.  Trial Tr. 510:12-516:22.  Roberts did not believe that the '481 and '580 patents read directly on the suspected products.  Trial Tr. 1566:11-23.

63.     The last section of the Nuclear Winter Scenario memorandum, entitled "PREPARATION FOR LITIGATION," stated that costs of litigation would be high and that Rambus would need to begin patents and infringement analysis, complete a discovery data base, and retain appropriate experts.  HTX 004.006.

64.     As of the late 1998 to early 1999 time frame, Rambus recognized that it would have to instigate litigation to establish the value of its patents and convince industry players to license its technology.  However, Rambus had not yet chosen a particular DRAM manufacturer to pursue and sue.  Several contingencies had to occur before Rambus would actually file suit:  (1) the direct RDRAM ramp had to be sufficiently developed so as not to jeopardize RDRAM production; (2) Rambus's patents covering non-RDRAM technology had to issue; (3) product samples from potentially infringing DRAM manufacturers had to be available in the market; (4) the non-compatible products had to be reverse engineered and claim charts had to be made showing coverage of the actual products; (5) Rambus's Board had to approve commencement of negotiations with a DRAM manufacturer; and (6) the targeted DRAM manufacturer had to reject Rambus's licensing terms.  *Hynix I*, 591 F. Supp. 2d at 1062.  However, Rambus fully expected that the contingencies would occur.  *Hynix II*, 465 F.3d at 1346.  "Contingencies whose resolutions are reasonably foreseeable do not foreclose a conclusion that litigation is reasonably foreseeable."  *Id.*; *see also Micron II*, 645 F.3d at 1324–25.

1    65.    On June 22, 1999, the '105 patent issued, the first patent-in-suit.

2    66.    On June 24, 1999, Tate instructed Karp to hammer out strategy for the first target to
3  be launched in October 1999.

4    67.    Karp prepared a document entitled "IP Q3'99–FINAL 7/1/99" which listed goals for:
5  procuring patents, initiating reverse engineering of infringing devices as required for litigation
6  preparation, developing a complete licensing strategy, preparing licensing positions against three
7  manufacturers and a litigation position against one of those three licensing targets, being ready for
8  litigation with thirty days notice, having a presentation to the Rambus Board ready by the end of the
9  third quarter for presentation during the fourth quarter, and organizing a 1999 shredding party at
10  Rambus.  HTX 140.003-004.

11    68.    In a strategy update presentation titled "IP Strategy 9/24/99," Rambus acknowledged
12  that it was losing Intel's business ("Intel Has Already Started To Let Go") and that, absent that
13  relationship, the DRAM industry would not have respect for Rambus's intellectual property.  HTX
14  244.  The update stated that Rambus must "INCREASE THE INDUSTRY'S PERCEPTION OF
15  OUR VALUE THROUGH AGGRESSIVE ASSERTION OF OUR IP RIGHTS."  HTX 244.003.
16  Specifically, Rambus needed to "earn that respect by substantiating our claims that cover pioneering
17  technology."  The update stated that:

18        "Patent claims are substantiated either by

19        • signing a lucrative license deal with (an) industry powerhouse(s)

20        • winning in court"

21  HTX 244.004.  The IP Strategy 9/24/99 concluded that the "Best route to IP credibility is through
22  victory over a major DRAM manufacturer" and "WE MUST WIN!!"  HTX 244.004-005.

23    69.    Karp and Steinberg developed a formula for selecting the first targets for Rambus's
24  licensing/litigation strategy.  The formula was set forth in a presentation dated October 14, 1999.
25  HTX 151.  The formula considered both business and legal/litigation factors.  Among the factors
26  weighed were "confirmation of Rambus IP," "experience in battle," "exposure to Rambus IP," "venue
27  flexibility," and "litigation story."  HTX 151.002.  Hynix was identified as the number three target
28  after Hitachi and Samsung.  HTX 151.006.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    70.    In October 1999, Rambus's Board and management approved commencement of

2  licensing negotiations for non-compatible products.  Trial Tr. 350:8-20 (Board approval); 1469:14-

3  18 ("executive core" approval).

**H.    Rambus's Formulation of its Document Retention Policy**

5    71.    The idea of instituting a document retention/disposal policy at Rambus was generated

6  by outside counsel Johnson at the meeting he had with Karp on February 12, 1998.  Trial Tr.

7  675:21-1678:20.  At that meeting, Johnson expressed concern that Rambus did not have a document

8  control system in place.  *See ¶¶ 39-40 above.*

9    72.    Johnson advised Rambus to gather critical company documents to start putting

10 together an electronic database and to adopt a company policy on document retention.  HTX 097.

11 Johnson testified that he recommended adopting a document retention policy for three principal

12 reasons.  First, a document retention policy would reduce the expense of retrieving electronic data

13 stored on obsolete or corrupted back-up media.  Trial Tr. at 1676:24-1677:10.  Second, a document

14 retention policy would reduce search costs in the event that Rambus was someday required to

15 respond to subpoenas or document requests that might be issued in connection with future lawsuits

16 or investigations.  Trial Tr. at 1677:11-14.  Third, the absence of a company-wide policy for the

17 retention and destruction of documents might be cited by a future litigant as evidence of spoliation.

18 Trial Tr. at 1678:10-20.  The evidence suggests that Rambus had never contemplated a document

19 retention program until Johnson recommended it.  It seems clear that Johnson was concerned about

20 Rambus getting entangled in litigation with its records in the shape that they were in at the time,

21 whether it was litigation brought by Rambus, initiated against Rambus, or in some way involving

22 Rambus's records.  Karp, Tate and Johnson all recognized that unsuccessful licensing negotiations

23 could result in litigation.

24    73.    Johnson testified that the advice he gave Rambus regarding document retention was

25 commonplace and that he probably gave similar advice to at least eight to ten start-up companies in

26 the Silicon Valley.  Trial Tr. 1678:21-1679:9.

27    74.    At this February 12, 1998 meeting, Johnson also advised Rambus to instruct its patent

28 prosecution attorneys to clean up their files for issued patents to ensure that the Rambus files were

1   the same as the official files, a recommendation that Johnson characterized as "standard advice."

2   Trial Tr. 409:18-410:1; 1679:10-1680:3; HTX 097.

3          75.    At a one-on-one meeting with Tate on February 25, 1998, Karp reported that he was

4   already "[w]orking with J. Lau on a document retention policy, discovery database, email, etc."

5   HTX 013.034.  Tate did not recall this meeting with Karp.  Trial Tr. 1275:8-12.  However, it was

6   Tate's practice to meet with his executive staff one-on-one every week to discuss goals and progress

7   toward goals.  Tate's inability to recall discussing document retention suggests that he was not

8   personally focused on document retention but on aggressively pursuing Rambus's patents with the

9   responsibility of how to do so left to Karp.

10         76.    On March 16, 1998, Roberts advised Joseph Lau, Engineering Department Head, that

11  Rambus should begin recycling its e-mail back-ups so that the back-ups had a "shorter shelf life."

12  HTX 100.  Roberts suggested three months.  *Id.*  There was a growing concern that e-mail back-ups

13  were discoverable.  Trial Tr.  1575:17-1577:4

14                 As I recall, the general concept was . . . that we were generating gigabytes of
                   information on surely a weekly basis, but maybe even on a daily basis that went onto
15                 tapes.
                       And that those tapes were being kept kind of continuously, and that if there
16                 was any case where somebody said we want to see all this information, it would be a
                   huge expense to pull all that information back and pay people to review it all.
17

18  Trial Tr. 1577:7-18.  Roberts said there was no litigation that Rambus was contemplating instituting

19  at the time nor any that would involve Rambus.  Trial Tr. 1576:14-20.

20         77.    On March 19, 1998, after an inquiry about document retention by Karp,

21  attorney Savage forwarded to Karp a standard, form document retention policy template that had

22  been developed by Cooley.  Trial Tr. 579:19-580:19; 582:19-24; RTX 091.  Attorney Savage was

23  unaware of any litigation strategy at the time she forwarded the template.  Trial Tr. 583:15-17.  In her

24  forwarding memorandum to Karp, she recommended that he consult Cooley attorney David Lisi if he

25  had any specific litigation oriented issues.  Trial Tr. 579:19-584:2; RTX 091 at R124437.

26         78.    The memorandum sent to Rambus by Cooley was a generic template for a document

27  retention program drafted by the law firm for its clients.  Trial Tr. 580:15-19.  In the forwarding

28  memorandum, Savage advised that "a comprehensive document retention policy must be customized

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  to conform to the Company's business practices and needs." RTX 091 at R124437. Karp did not

2  consult Savage or Lisi regarding tailoring the template for Rambus.

3      79.     On March 27, 1998, after he had left Cooley to join Fenwick & West, attorney

4  Johnson had a lunch meeting with Karp. Following that lunch, Johnson wrote Karp saying "I am

5  excited about the possibility of working with you." Attorney Johnson also enclosed "a standard set

6  of document requests," saying "[t]his should give you some idea of the type of information requested

7  in patent cases." HTX 368; Trial Tr. 1713:15-1716:9.

8      80.     The Cooley template retention policy stated that "'[t]hat Policy should inform

9  employees email is subject to review by the Company and is not 'private.'" RTX 091 at R124443.

10  The Cooley template also recommended that the company should "permanently remove emails from

11  system server on a periodic basis" and if back-up tapes of e-mail are kept, they "should be destroyed

12  on a periodic basis as well." *Id.* It also stated that "the Company and individual employees should

13  be discouraged from archiving email" and that "E-mail that needs to be saved should be either:

14  (a) printed in hard copy and kept in the appropriate file; or (b) downloaded to a computer file and

15  kept electronically or on disk as a separate file." *Id.* The memorandum also recommended that

16  Rambus "regularly discard outdated electronic files and discard all draft documents once a document

17  is finalized." *Id.*

18      81.     At the same time that Rambus was consulting with outside counsel regarding the

19  adoption of a document retention policy, Rambus retained Kroll Associates, a specialist in the field

20  of information and computer security, to do a security audit of Rambus. Rambus contacted Kroll

21  because it had security concerns after a hacking attempt on Rambus's computers. Trial Tr. 369:18-

22  370:20. In an April 24, 1998 presentation at the conclusion of the security audit, Kroll advised that

23  Rambus adopt a variety of measures to better protect its confidential information and the confidential

24  information of its business partners. Brill Depo at 49:15-50:1; 50:13-18. Among the specific

25  recommendations from Kroll was confirmation that Rambus should work with outside counsel to

26  develop a document retention policy. Trial Tr. 372:25-373:23; RTX 160 at 26. Brill also advised

27  that Rambus should keep e-mail only as long as required and that back-up tapes should not be kept

28  indefinitely. RTX 160 at 26, 47; Brill Depo at 55:19-57:14 (played at trial on October 28, 2005);

1  Trial Tr. 1515:21-23, 15:178-9.  Kroll was not involved in formulating a specific document retention

2  program for Rambus.

3       82.    On May 14, 1998, Karp met with a group of representatives of the four Rambus

4  operating divisions to decide on a policy for saving back-up tapes.  He then sent a memorandum to

5  the Rambus Board, engineering managers, and others at Rambus stating:  "Effective immediately, the

6  policy is that full system back-up tapes will be saved for 3 months only.  Therefore, you can no

7  longer depend on the full back ups for archival purposes.  Any valuable data, engineering or

8  otherwise, must be archived separately."  RTX 104.  Karp's memorandum further advised:  "I will

9  now start the task of implementing a company-wide document retention policy.  Every Rambus

10  employee will be involved in this. . . .  I expect to have a company meeting in early June to kick off

11  this policy."  *Id.*  Karp consulted with attorney Johnson about the length of time to retain back-up

12  tapes.  Trial Tr. 528:21-530:4; 1691:23-1692:6; RTX 104.  Johnson recommended against adopting a

13  proposal to create a full system back-up every two years, citing the problems and potential expense

14  that could arise from stale data, operating system changes, and corrupt data.  Trial Tr. 1692:7-17.

15       83.    Karp drafted Rambus's Document Retention Policy shortly before July 22, 1998,

16  based upon the generic template forwarded by attorney Savage, and incorporating some of its

17  language *verbatim*.  Trial Tr. 525:7-17; HTX 023.  The Rambus policy provided with respect to

18  "Electronic Mail and Documents" that "Rambus maintains complete system tape back-ups for a

19  period of 3 months.  Employees should not utilize email as a place to save documents beyond 3

20  months.  Email that is required to be saved more than 3 months can be kept either in paper or a

21  separate file on your hard drive."  HTX 023.

22       84.    The Rambus policy stated that:

23      documents, notebooks, computer files, etc., relating to patent disclosures and proof of
    invention dates are of great value to Rambus and should be kept permanently.
24      Engineering personnel should not depend on the electronic system back-up tapes to
    archive their work, since these tapes are only kept for 3 months.  They should create
25      their own archive copies of, for example, tape out and major project milestone
    databases, which can then be kept indefinitely in Rambus' offsite, secure storage
26      facility.

27  HTX 023.001-002.

28       85.    The Rambus policy pronounced that "Final, execution copies of all contracts entered

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  into by Rambus are kept at least 5 years after the expiration of the agreement . . . .  All drafts . . . and

2  any materials used during negotiations that are not part of the final binding contract . . . should be

3  destroyed or systematically discarded."  HTX 023.002

4         86.     The terms of Rambus's two-page Document Retention Policy were based on the

5  template provided by attorney Savage, referred only to categories of documents, and were content

6  neutral within those categories.  HTX 023; RTX 091.  The policy contained no directive to discard

7  documents relating to specific companies or specific subjects.  However, it did instruct that

8  "documents, notebooks, computer files, etc. relating to patent disclosures and proof of invention

9  dates are of great value to Rambus and should be kept permanently."  HTX 023.001.

10      **I.**     **Presentation of Rambus's Document Retention Policy**

11         87.     After Karp had drafted the Policy, he created slides for use in a presentation

12  introducing the Document Retention Policy to Rambus's managers.  Karp sent his two-page

13  Document Retention Policy to attorney Johnson for his review.  Trial Tr. 521:20-522:10; 1692:18-

14  1693:2; 1693:13-25.

15         88.     On July 22, 1998, Rambus distributed its two-page Document Retention Policy to its

16  employees.  HTX 023.

17         89.     On July 22, 1998, attorney Johnson and Karp gave a presentation to Rambus's

18  managers about the need for such a policy and the legal requirements relevant to the policy.  RTX

19  130.  The presentation distinguished between obligations before litigation and after litigation

20  commences.  *Id.*

21         90.     Karp's portion of the presentation consisted of a summary of the types of documents

22  Rambus wanted to keep and for how long.  Attorney Johnson reviewed and commented on drafts of

23  Karp's slides.  Trial Tr. 535:4-11; 1699:11-1701:4; RTX 112; RTX 115; RTX 123.  Rambus,

24  however, is not relying on an advice of counsel defense as a defense to Hynix's spoliation claim.

25  Trial Tr. 1801:25.  In presenting his slides to Rambus managers and employees, Karp gave explicit

26  instructions to delete e-mails.  Trial Tr. 261:4-265:1.

27         91.     Attorney Johnson's portion of the presentation was litigation-oriented.  Slide 3 listed

28  what kind of records are discoverable.  Slide 4 cautioned specifically about e-mail and electronic

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   documents.  It noted that "special care must be taken with emails" because they are "generally less

2   formal and thoughtful than written correspondence."  Slide 5 recounted what Johnson referred to as

3   "horror stories" of cases where deleted e-mails had been used to prove age discrimination and sexual

4   harassment.  Slides 6 and 7 warned that the rules for document retention change once litigation

5   begins.  RTX130; HTX111.004-008[5].   Attorney Johnson testified that "[a]nd the act of deleting,

6   when you are actively involved in litigation, that can give rise to a claim, and I was trying to explain

7   to the client that this was serious business."  Trial Tr. 1699:7-10.  Johnson also advised that "[a]

8   formal document retention policy will likely shield a company from any negative inferences . . . due

9   to destruction of documents, unless the policy was instituted in bad faith or exercised in order to

10  limit damaging evidence available to potential plaintiffs."  RTX 130 at R124523.  He also warned

11  Rambus managers, however, that destroying relevant documents once litigation started would be

12  improper.  RTX 130 at 124527-28, 124545-49; Trial Tr. 1722:2-11.  "Once litigation has

13  commenced, a party cannot destroy either relevant evidence or discoverable information.  If relevant

14  evidence is destroyed, the party may be liable for sanctions, up to and including default judgment."

15  RTX 130 at 124544.  One of the slides from the "After a lawsuit is filed" section of the slide

16  presentation instructed:  "Gather all 'sensitive' files as soon a possible to avoid inadvertent

17  destruction."

18      92.      Johnson did talk to Rambus about potential patent claims in the abstract.  Trial Tr.

19  1725:6-12.  He did not view his contribution to the July 22, 1998 presentation as a legal opinion that

20  Rambus was free to dispose of evidence relevant to such potential patent claims.  Trial Tr. 1725:6-

21  1726:2.  Moreover, Johnson expressly told Rambus that, if Rambus was "anticipating filing a

22  lawsuit, it could not commence a document retention policy."  Trial Tr. 1721:18-1722:6.

23      93.      One of the slides that Karp prepared contained the messages "EMAIL - THROW IT

24  AWAY" and "LOOK FOR THINGS TO KEEP."  HTX 112.001.  Karp explained that he recalled

25  some questions from employees about how to decide what to keep.  Karp responded that he could

26

27      [5]      The slides stated that the rules regarding disposal of documents change once litigation
28  begins.  However, they should have said that the rules change when litigation is reasonably
    foreseeable.

1   not tell them what to do within in their areas.  Trial Tr. 539:3-12.  No standards were distributed by

2   Rambus management as to what to keep other the general description in the policy.  *See* HTX 023.

3   Craig Hampel, who joined Rambus in 1993 and later became its technical director, did say that Karp,

4   at a staff meeting explaining the reasons for the policy, stated that there was no reason to keep

5   documents that were not needed except, for example, proof of invention and gave as an example of a

6   document not to keep one that questioned the patentability of a concept.

7          Q. Was anything said about the reasons for instituting this new policy?
           A. A couple of examples of why it's a good idea not -- not to keep stuff around were
8          cited, yeah.
           Q. What were those examples?
9          A. Things like apparently discussions on patentability of a -- of a concept.  If for
           some reason you had a third party in the company that said that this idea isn't patented
10         -- maybe they were wrong even, but they said it's not patentable for some reason,
           having that email around could be used in the prosecution of the patent, or at some
11         later date. So it was examples like that given, where it's not a good idea to have the
           discussion on the idea, the formulation of the idea, and its patentability prior to
12         applying for a patent.

13   *Micron I* Trial Tr. 1302:7-20; 1303:21-1304:14.[6]  Hampel's testimony was not offered by Hynix in

14   the original proceedings before this court.  Hynix now offers this somewhat unclear testimony to

15   suggest that Rambus deliberately selected damaging documents to destroy.  It appears, however, that

16   Karp was not concerned about any actual damaging e-mails or records that he knew existed but

17   rather about the possibility that there could be speculative adverse comments by a third party or other

18   stray remarks that might be found by an adversary in the course of discovery.   Johnson and Karp

19   emphasized that e-mail was discoverable.  HTX 112.001; Trial Tr. 1575:17-1577:18.  Attorney

20   Johnson expressed concern about Karp's repeated direction to Rambus employees to "look for things

21   to keep."  HTX 112.  Johnson told Karp that such a directive would result in the retention of more

22   documents than Rambus employees were otherwise required to keep.  Johnson told Karp that "unless

23   you've got some kind of standard as to what to keep and what not to keep, they're going to keep

24   everything, because engineers are pack rats."  Trial Tr. 1700:11-1701:1.  Karp nevertheless chose to

25   keep the language in his slides.  Trial Tr. 1701:2-4.

26   _____

27          [6]      Hampel's testimony is considered in connection with this court's reconsideration of
     the spoliation issue in light of Rambus's concession that the factual records of the *Micron* and *Hynix*
28   cases are essentially identical.  *See* fn. 2 *above*.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

94.     After his July 22, 1998 presentation, Johnson no longer assisted Rambus in its licensing, litigation, or patent prosecution strategy.  Karp merely asked Johnson "truly random" questions from time-to-time about general litigation related matters, such as arbitration and different venues for litigation.  Trial Tr. 1719:20-1721:17; RTX 348; RTX 350; RTX 354.

95.     After presenting the Document Retention Policy jointly with attorney Johnson to the Rambus managers, Karp made presentations to various groups of Rambus employees using a different set of slides, which were based on the written policy.  Trial Tr. 262:19-263:5; HTX 112. All versions of the presentation utilized a slide entitled "Email – Throw it Away."  The slide emphasized that e-mail was discoverable in litigation and that elimination of e-mail is an integral part of document control.  It also advised that messages that must be saved should be saved to a separate file or printed and retained.  HTX 111.010.

**J.     Specific Events Involving the Destruction of Documents**

**1.     Electronic Documents**

96.     Until approximately 1996, Rambus's business work was done on Macintosh computers.  Engineering work, by contrast, was typically done on UNIX workstations.  Trial Tr. 1439:4-6; 1440:2-11.  Rambus maintained back-up tapes of some of the data created on the Macintosh computers.  In May 1998, Karp confirmed that back-up tapes of the company's Macintosh computers were gone.  Trial Tr. 208:19-218:14; HTX 013.097.

97.     As of 1998, Rambus employees had retained many papers, documents and electronic data.  Trial Tr. 195:18-196:4; 532:8-533:6;1582:11-1583:13.

98.     Sometime in Spring 1998 (the evidence suggests April) Karp asked Rambus engineer Barth for conception date information for "Direct Rambus material."  Trial Tr. 224:4-225:22; HTX 013.081.  Barth "went into his computer and pulled up a file," but "in the process of pulling up the file, the date changed on it," which "made it necessary to try to find it on a backup," which they successfully did.  Trial Tr. 224:4-226:24. Although Karp's retrieval of conception date data was consistent with Cooley's recommendation to preserve intellectual property materials, *see* RTX 091 at 124442, it was not retrieved as part of any review of tapes to determine what should or should not be kept.

99.     On or before July 21, 1998, and pursuant to its decision not to keep e-mail for more than three months, Rambus sent 1269 computer tapes out to be degaussed (magnetically scrambled to prevent data recovery).  Trial Tr. 221:22-223:4, 1105:25-1106:25; HTX 107, HTX 157, HTX 029. Prior to sending the tapes to be degaussed, Rambus separated its back-up tapes into two sets: (1) project tapes containing only technical project data and (2) other tapes.  The "other tapes" were sent for degaussing without further review of the contents.  Trial Tr. 1105:17-1106:25.  There is no record of the electronic data destroyed.  Trial Tr. 334:2-12; 524:22-525:1.

100.    In 2005, Rambus found additional electronic media in its office premises, including six boxes of tapes in a computer equipment storage "cage" in Rambus's garage.  Rambus provided a verified statement regarding the circumstances in which the electronic media were discovered.  HTX 090.  In addition, Rambus offered testimony at trial explaining the discovery of these back-up tapes. Trial Tr. 1080:5-1092:21.  Rambus acted promptly to review and produce responsive documents from these tapes once it realized they contained potentially discoverable information.

## 2.     Prosecution Files

101.     Attorney Johnson advised Karp at the February 12, 1998 meeting that Rambus should clean out its patent prosecution files so that the files mirrored the PTO files.

102.    Attorney Vincent of BSTZ prosecuted patent applications on behalf of Rambus claiming priority to Rambus's original '898 application, as did other BSTZ attorneys including Roland Cortes and Scott Griffin.  Trial Tr. 784:1-785:2; 1592:22-1593:9; 1603:19-1604:11.

103.    In April 1999, Karp instructed Vincent to clean out BSTZ's patent prosecution files for patents which had issued.  Trial Tr. 806:5-807:5; 812:3-14; HTX 135.004.  Vincent was not told that any litigation was planned against manufacturers of JEDEC standard SDRAM or other non-conforming DRAM.  Trial Tr. 812:15-21.  Karp did not provide details as to what documents should be discarded from the files; rather, Vincent was guided by his "general professional knowledge" regarding document retention for patent files.  Trial Tr. 904:11-24.

104.     Vincent was not instructed to, and did not, clean out any of BSTZ's "general" Rambus files.  Trial Tr. 908:25-909:7.  The general files contained, among other papers, Vincent's notes and other documents relating to his advice to Rambus concerning the JEDEC disclosure policy

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

29

1    and equitable estoppel.  Trial Tr. 908:20-24; *see, e.g.*, HTX 192.001 (March 27, 1992 notes by Lester

2    Vincent referring to JEDEC and equitable estoppel).  These documents were retained and produced.

3    Trial Tr. 909:10-910:6; 911:9-25; RTX 179 (January 31, 2000 cover letter from Vincent to Neil

4    Steinberg transmitting copies of various BSTZ general files).

5         105.    Some drafts and notes from BSTZ's patent prosecution files which were copies or

6    otherwise deemed unimportant were discarded as a matter of common practice of BSTZ's attorneys

7    before Karp made his request to Vincent.  Trial Tr. 905:12-906:8; 1607:19-609:5.  Attorneys Griffin

8    and Cortes understood that it was the firm policy at BSTZ to conform a patent file to that in the PTO

9    upon issuance of the patent.  Trial Tr. 1598:2-1600:19; 1606:18-1607:10.  They followed this policy

10   and cleaned out patent files upon issuance (or had clerical staff do so) before they had received any

11   request from Karp that they do so.  Trial Tr. 1598:2-1600:19; 1602:18-1607:10.  Griffin left BSTZ in

12   April 1996, approximately three years before Karp's request to Vincent, and Cortes left BSTZ in

13   April 1999, at approximately the time of Karp's request.  Trial Tr. 1592:11-14; 1603:14-18.  Cortes

14   and Griffin each prosecuted to issuance Rambus patent applications claiming priority of the original

15   Rambus patent application, including U.S. Patent Nos. 5,513,327, 5,657,481, and 5,841,580.  These

16   files presumably would have been purged by them after issuance of the patents.  Trial Tr. 1593:10-

17   1598:1; 1604:12-1606:17; HTX 005A (indicating that the '327, '481, and '580 patents correspond to

18   BSTZ file numbers P001C2, P007DC and P043D2, respectively).

19        106.    BSTZ's patent prosecution files were organized into three parts: left, center, and right.

20   The left side had correspondence and notes, the center typically had prior art, conception, and

21   reduction to practice documents and drafts, and the right side had communications with the PTO.

22   Trial Tr. 895:3-896:11.  When cleaning Rambus patent prosecution files for issued patents, Vincent

23   retained, among other things, communications with the PTO, which constituted the right side of the

24   file, as well as prior art and conception and reduction to practice documents, which were located in

25   the center of the file.  *Id*.  Other documents were discarded from the center and the left side of the

26   file.  *Id*.

27        107.    On February 1, 2000, Vincent provided copies to Rambus of the left and center parts

28   of all but one of BSTZ's patent prosecution files for applications claiming priority to the '898

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   application.  Trial Tr. 912:1-23; RTX 181 (February 1, 2000 cover letter from Lester Vincent to Neil

2   Steinberg enclosing copies of files).  The remaining file was omitted due to an oversight and was

3   provided later.  Trial Tr. 913:3-17.

4          108.    Vincent did not clean out any Rambus patent files between July 28, 1999 and

5   June 23, 2000.  HTX 327.  Vincent once again began cleaning out patent files on or after June 23,

6   2000, the date he learned of the Hitachi settlement.  Trial Tr. 894:18-21.  Rambus had not advised

7   Vincent that it had notified Hynix that it was infringing Rambus's patents.  Trial Tr. 894:22-895:2.

8          109.    Vincent's renewed cleaning of patent files after June 23, 2000 does not appear to have

9   had any impact on the documents produced in this litigation.  As noted above, by that date the

10   subject BSTZ patent files already had been provided to Rambus.  Trial Tr. 914:3-12.

11          110.    The court finds that no material documents were rendered unavailable to Hynix from

12   the files of any of the patents-in-suit as a result of Karp's request to Vincent.  Of the fifteen patents

13   that have been asserted by Rambus in this litigation, Hynix has alleged that the files of three of them

14   – U.S. Patent Nos. 5,915,105, 5,954,804, and 6,101,152 – were cleaned out by Vincent.  HTX 005A.

15   However, the record indicates that although certain documents may have been discarded by Vincent

16   in compliance with BSTZ policy, no evidence suggests that any material documents were discarded

17   from any prosecution files as a result of Karp's request that BSTZ clean out its files.  The record

18   supports the conclusion that prior art was retained.

19                          **3.    Shred Days**

20          111.    On September 3 and 4, 1998, Rambus employees participated in Shred Day 1998.

21   Rambus employed an outside company, Sure Shred, to provide on-site document shredding services.

22   *See* HTX 125; Trial Tr. 1614:16-1615:11.  Employees were instructed to follow the Document

23   Retention Policy guidelines to determine what to keep and what to throw away.  Trial Tr. 272:14-

24   273:14; HTX 122.  Employees were given burlap sacks from Sure Shred for material that needed

25   shredding.  The burlap sacks were then taken to a shredding truck in the parking lot of the company.

26   *Id.*  Prior to Shred Day 1998, each employee had a box in his or her office area for confidential

27   documents that needed to be shredded, and a truck came once a week to pick up the documents for

28   shredding.  Trial Tr. 1581:13-1582:10.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

31

112.    Rambus destroyed approximately 185 bags and 60 boxes of material on Shred Day 1998. HTX 125. The amount of documents destroyed would have totaled, on the high side, 430 banker boxes of material. Trial Tr. 1615:12-1616:18. Rambus had 145 employees at the time. Jt. Pretrial Stmt. at 8.

113.    A year later, on August 26, 1999, Rambus held Shred Day 1999. The bulk of the documents destroyed on the shred days consisted of "mountains of printouts of circuit design that engineers had." Trial Tr. 337:10-338:3. Rambus had 165 employees in 1999, most of whom were engineers working on RDRAM technology. Trial Tr. 1395:13-20; 1542:8-1544:2.

114.    In December 2000, Rambus held Shred Day 2000. Rambus employees destroyed 410 bags (the equivalent of 300-400 boxes) of documents during Shred Day 2000. RTX 216; Trial Tr. 1622:22-25.

115.    The use of burlap bags and shredders and the social events at the end of the shred days were not exceptional practices by high tech companies. David Rhoads of Sure Shred suggested that Rambus's disposal practices were no different from the disposal habits of other similarly situated companies. Trial Tr. 1612:5-1623:15. Rhoads testified that his company frequently provided pick up services "where it's time to purge records on an annual basis, or [a company has] just begun a document destruction program so they call us out to do a big purge." Trial Tr. 1612:24-1613:2. He observed that on these annual "purge days," companies often have an "event" and serve food as part of that "event" as Rambus did. 1613:18-21.

116.    Rambus did not make any record of what was disposed of during its shred days.

**K.    Rambus Initiates Litigation**

117.    At the beginning of each year, Rambus went through a budgeting process to allocate where money would be spent. Tate testified that through 1999, expenditures over $5,000 to $10,000 would be in the budget. Trial Tr. 1570:1-1571:13. In 1998, attorney Johnson told Rambus that pursuing litigation against a DRAM manufacturer would likely cost between $1.5 and $3 million. Trial Tr. 518:13-519:3; HTX 004.006; RTX 354 at R125823. Rambus did not budget any money in 1998 or 1999 for litigation against a DRAM manufacturer. Trial Tr. 376:23-378:21; 383:15-18; 383:23-384:14; RTX161.

118.    Rambus initiated licensing negotiations with Hitachi on October 22, 1999 by sending Hitachi a letter suggesting that Hitachi's products infringed Rambus's patents.  HTX 015.  Hitachi refused to respond to Rambus's efforts to negotiate.

119.    On November 23, 1999, an "IP Update" was presented at a Rambus meeting which updated the number of Rambus patents issued, applications pending, and applications still to be filed. The Update also announced that Rambus had begun to assert its rights against infringers under the "LEXINGTON" initiative—"THE SHOT HEARD ROUND THE WORLD."  HTX 155.

120.    Rambus conducted a "beauty contest" in late November or early December 1999 to select counsel for litigation against Hitachi.  Trial Tr. 1475:9-23.  Rambus retained Gray Cary as litigation counsel for the *Hitachi* matter in late 1999. Trial Tr. 705:6-9.

121.    Rambus filed suit against Hitachi on January 18, 2000.  Although Rambus management preferred to keep the Board apprised of significant issues, Board approval was not required for Rambus to initiate the litigation.  *See Micron I*, 255 F.R.D. at 146 n.53.

122.    Attorney Steinberg testified that in or around December 1999, he and Karp identified Rambus personnel who were likely to have relevant documents and told them to retain all such documents.  Lawyers from Gray Cary, after the firm was retained in connection with the *Hitachi* litigation, also instructed dozens of Rambus employees that they needed to preserve all documents that could be relevant to the litigation.  Trial Tr. 775:12--776:10.

**L.    Rambus's Resumption of the Destruction of Documents**

123.    The Hitachi litigation was settled on June 23, 2000.  Trial Tr. 892:3-7.   On that day, Rambus sent an infringement notice to Hynix (then Hyundai), another DRAM manufacturer, initiating Rambus's licensing strategy as to Hynix.  RTX 401.

124.    On or about that day, attorney Vincent resumed purging his patent files.  Trial Tr. 893:3-7.  He did not know that Rambus had sent a notice to Hynix that it infringed Rambus's patents.  Trial Tr. 894:22-895:2.

125.    On July 17, 2000, attorney Steinberg sent an e-mail to Rambus executives to "remind [them] of the Rambus Document Retention Policy relating to contracts," specifically that drafts and materials used during negotiations should be destroyed or systematically discarded.  HTX 178.002.

126.     Rambus initiated suit against Infineon, a DRAM manufacturer, on August 8, 2000.

127.     In December 2000, Rambus moved to a new office building.  As part of the office move, Sure Shred disposed of materials that did not need to be moved from the old site to the new site.  Rhoads of Sure Shred explained that shredding in connection with office moves is one of the primary reasons his company is called because it is cheaper to shred than to move materials and destroy them later.  Trial Tr. 1623:5–15.

128.     Prior to the current litigation with Hynix, Rambus had not disclosed to its litigation counsel the amount of document destruction it had undertaken.  Sean Cunningham, one of the Gray Cary attorneys on the Hitachi litigation team, was not aware of the shred days.  Cecilia Gonzales, one of the Howrey Simon attorneys on the Hitachi and Infineon litigation teams, was told by attorney Steinberg about Shred Day 1998, but found out about Shred Days 1999 and 2000 only after reading the Federal Circuit decision in the appeal from the original judgment in *Rambus, Inc. v. Infineon Tech. AG*, 155 F. Supp. 2d 668 (E.D. Va. 2001).

### M.     Micron and Hynix Institute Litigation Against Rambus

129.     On August 18, 2000, Rambus approached Micron about the possibility of Micron taking a license for its SDRAM production.  Micron filed a declaratory judgment action against Rambus in the District of Delaware on August 28, 2000, asserting invalidity, non-infringement, and unenforceability.  *Micron II*, 465 F.3d at 319.

130.     The following day, Hynix Semiconductor filed a similar declaratory judgment suit against Rambus in the Northern District of California.  *Id.*

### N.     Possible Prejudice from Document Destruction

131.     As of 1998, Rambus employees had kept extensive paper files and preserved many records on their laptop computers, on zip discs and on other removable media.  Trial Tr. 274:22-275:5; 532:21-533:6; 1187:23-1188:75.  This included a large volume of external e-mail communications.  Trial Tr. 1582:11- 1583:13.  Rambus IP managers had followed the practice of preserving back-up tapes for most data stored in Rambus's computer system.  Rambus began implementation of its Document Retention Policy in July 1998 when it destroyed "all but 1 of the 1269 tapes storing [Rambus's] email backups from the previous years."  *Micron*, 645 F.3d at 1318.

1   On the shred days in September of 1998 and August of 1999 voluminous boxes and bags of

2   accumulated material were destroyed.  Findings of Fact 111-113 ("FF_____").  Karp expected

3   everyone at Rambus to follow the Document Retention Policy in discarding documents.  Trial Tr.

4   334:13-17.  Although the bulk of what was destroyed on the shred days consisted of computer print

5   outs of circuit designs, Trial Tr. 334:4-338:8, other types of records were also destroyed.  Karp

6   advised that documents that were not needed should generally be discarded.  *Micron I* Trial Tr.

7   1302:7-20; 1303:21-1304:14.  Rambus did not keep a log or record of the documents it destroyed.

8   Trial Tr. 334:2-12; 524:22-525:6; 1118:15-19.  Therefore, there is no way to tell what documents

9   were destroyed.  Hynix suggests that the discarded records may have included information that

10  would have been material to its defenses and claims against Rambus, and thus that it has been

11  prejudiced in its litigation with Rambus.  Hynix makes the following suggestions as to what the

12  destroyed evidence might have been.

13                    **1.    JEDEC-Related Documents at Rambus**

14        132.    Hynix suggests that relevant JEDEC-related documents may have been destroyed

15  during one of the shred days.

16        133.    Rambus's JEDEC representative, Richard Crisp, kept his e-mail reports to

17  Rambus executives on his PC laptop computer when Rambus transitioned from Macintosh to IBM

18  and then to Toshiba laptops.  Trial Tr. 1212:10-1213:4.  Crisp went through his e-mail files pursuant

19  to the Document Retention Policy's requirement to "look for things to keep."  Trial Tr. 1211:19-

20  1212:4.  He kept the e-mails he had sent to Rambus executives regarding JEDEC because he

21  "thought they were important and they were essentially the records of what [he had] been doing for a

22  number of years while working for the company."  Trial Tr. 1213:5-14.

23        134.    After Crisp left Rambus and after patent litigation had commenced, Crisp located

24  various JEDEC trip reports and other JEDEC-related e-mails on a Macintosh drive in his attic.  Upon

25  locating these e-mails, Crisp turned them over to attorney Steinberg for production in litigation.

26  Steinberg then turned the e-mails over to outside counsel for use in the various lawsuits, including

27  the instant case.  Rambus appears to have produced to Hynix two sets of Crisp's JEDEC trip reports.

28  Trial Tr. 756:8-757:14; 1213:15-1215:10; HTX 182; RTX 41, 206, and 359.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

135.    Materials, however, that Crisp had received from JEDEC or obtained at JEDEC meetings such as unopened envelopes containing paper ballots, official minutes of JEDEC meetings and presentations by members were destroyed.  Trial Tr. 1168:5-1169:17.  Some of these documents would have been maintained by JEDEC.  However, it appears that Crisp accumulated numerous documents that were put into burlap sacks and shredded.  Trial Tr. 275:23-25.  Karp described Crisp as a "pack rat" and stated that his office looked like a "garage dump" and "[y]ou couldn't even get in the place." *Id.* at 275:2-15.

136.    Evidence of internal communications at Rambus related to what Crisp learned at JEDEC and how Rambus used that information may have been destroyed during a shred day.  Crisp forwarded his trip reports to various executives at Rambus.  In March 1994, Dave Mooring, then President of Rambus, commented to Crisp in an e-mail that the "your JEDEC emails are great!!!! The content as well as delivery.  I forward them liberally."  HTX 220.1.  Despite Mooring's interest in and liberal distribution of the reports, there were few Rambus documents produced discussing Crisp's reports. Therefore, it is not unreasonable to suspect that Rambus destroyed internal documents other than Crisp's trip reports concerning what went on at JEDEC during the period of time when Rambus was a member.

137.    Hynix contended in the conduct phase of the trial that members of JEDEC had a duty to disclose any patents or patent applications that they had made and any intent they had to apply for patents that related to standards being considered by JEDEC.  Hynix contended that this disclosure obligation existed so that standards could be developed with the knowledge of any potential patent coverage of a standard being considered.  Hynix further claimed that Rambus attended JEDEC meetings and learned what standards were being considered by JEDEC and then, without disclosing its intentions to JEDEC members, amended its patent applications to cover certain features that JEDEC was discussing for inclusion in the JEDEC SDRAM and DDR standards. Hynix also asserted that Rambus deliberately failed to tell the JEDEC members of its intentions until after Hynix and other members who manufactured DRAMs had invested substantial sums of money developing and manufacturing products that complied with the JEDEC standards.  Hynix contends that at that point it was "locked in" to manufacturing products that infringed patents belonging to

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  Rambus.  Documents that were destroyed may have revealed more information than was otherwise

2  available about the scope of Rambus's disclosure obligation, and whether Rambus believed any of its

3  patents or patent applications covered  SDRAM.  Destroyed documents may have also shed light on

4  Rambus's plans to gain market power, how it intended to compete, and on what sources of

5  information Rambus relied upon in drafting its amended patent applications. In summary, Hynix may

6  have been able to use information contained in documents that were destroyed in supporting its

7  antitrust and fraud claims and its collateral estoppel and waiver defenses.

8          **2.      Licensing Relationship Between Hynix and Rambus**

9          138.    Hynix suggests that destroyed Rambus documents might have provided useful

10  information about Rambus's intent and motives during licensing discussions with Hynix including

11  Rambus's belief as to Hynix's understanding of the "other DRAM" provision.  Such information,

12  Hynix contends, could possibly have provided support for its claim of an implied license.  Hynix

13  points to the absence of any internal Rambus communications concerning the Hyundai-LGS merger

14  and why Rambus chose the LGS license agreement to govern the contractual relationship between

15  Hynix and Rambus after the merger.  Hynix also points out that Rambus's Document Retention

16  Policy specifically called for the destruction of draft contract and related negotiation materials.  HTX

17  114.002.

18          139.    Hynix, however, acknowledged that a "fairly complete record" was produced of

19  the external communications between Rambus and Hyundai regarding the negotiations for a

20  proposed amendment to their December 1995 RDRAM agreement. Trial Tr. 982:23-983:3.

21          140.    The external correspondence between the parties regarding the Hyundai-LGS

22  merger and adoption of the LGS licensing terms was preserved and produced.  Trial Tr. 983:10-24.

23          141.    Rambus either preserved and produced or logged as privileged internal

24  communications regarding these topics, including internal communications discussing possible

25  elimination or modification of the "Other DRAM" clause contained in the 1995 agreement with

26  Hyundai and internal documents regarding the consequences of the Hyundai-LGS merger.  These

27  communications include the following:

28          (a)      an internal e-mail from Tate to Roberts dated April 2, 1998, discussing Hyundai and

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

the possibility of "terminating their royalty deal for non-Rambus DRAMs" (Trial Tr. 1031:10-1032:23);

(b)     an internal e-mail dated April 3, 1998, incorporating and replying to the April 2, 1998 Tate e-mail (Trial Tr. 1032:24-1034:1);

(c)     an internal document dated April 3, 1998, discussing Hyundai and that Rambus's "action would most likely force them back to the negotiating table at which time we could argue to change some of the favorable terms we granted them first time around" (Trial Tr. 1047:2-1048:19);

(d)     an internal e-mail from Rambus business development manager Deepak Mithani to executives at Rambus discussing Tate's April 2, 1998 directive, and noting that Rambus could "negotiate the special arrangement for allowing [Hyundai] to use our IP for the competing devices" (Trial Tr. 1048:20-1050:3);

(e)     an internal e-mail reporting on a meeting with Mr. Yoo of Hyundai, and noting that Yoo was informed that one option was to "renegotiate the agreement and remove the Other DRAM clause" (Trial Tr. 1050:4-1051:2);

(f)     an internal e-mail from Tate to Roberts dated July 10, 1998, discussing the amendment negotiations with Hyundai (HTX087; Trial Tr. 1029:1-20);

(g)     an internal e-mail written by Tate regarding his discussion with K.H. Oh of Hyundai, regarding Rambus's "request for [Hyundai] to take goodie out of the contract," and reflecting Tate's agreement to "hold off on our concurrent/contract issues" pending agreement from Hyundai on marketing commitments (Trial Tr. 1051:3-1052:5);

(h)     an internal meeting report by Mithani stating that Hyundai had a "change in attitude" and appeared to be "100 percent behind Rambus" in marketing (Trial Tr. 1055:3-1056:11);

(i)     an internal e-mail from Steinberg to various Rambus executives dated January 4, 2000, "providing legal advice regarding assignment of license agreement" (HTX 216 (Rambus Privilege Log Entry 963); and

(j)     an internal memorandum from Mr. Bernsten to Steinberg dated January 27, 2000, "reflecting legal advice and analysis regarding Hyundai's licensing obligations to Rambus."

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    HTX 216 (Rambus Privilege Log Entry 4048).

2        142.    This record suggests that no internal Rambus documents were destroyed that would

3    have supported Hynix's claim of an implied license to Rambus's technology for non-compatible uses,

4    or that would have explained Rambus's reasons for asserting that the LGS Agreement governed

5    rather than the Hyundai license.

6                        **3.    Inventor Materials**

7        143.    Hynix points out that some of the early design and presentation records of the

8    inventors were destroyed and suggests that such records may have contained relevant and material

9    evidence supporting its defenses.  For example, the written description defense requires Hynix to

10   show that Rambus's original '898 application does not support the claims-at-issue. Hynix contends

11   that Rambus knew that documentary evidence relating to the date of conception and the inventors'

12   possession and understanding of what they had invented was important.  *See* HTX 112.004; HTX

13   114.002. The Document Retention Plan expressly called for information related to patent disclosures

14   and proof of invention dates to be kept permanently.  *Id.*

15       144.    Some initial design materials and early technical presentations by Farmwald

16   and Horowitz were destroyed and thus not produced.  Trial Tr. 608:10-610:25; 614:5-15; *see* HTX

17   267.

18       145.    During Shred Day 1998 Rambus destroyed without Horowitz's permission some of

19   Horowitz's early presentation documents that Horowitz had maintained.  Trial Tr. 611:13-25;

20   613:15-616:20.

21       146.    Horowitz did a "fairly extensive search" of literature in the area of circuit design

22   in advance of the April 1990 filing of the original Farmwald-Horowitz application.  Trial Tr. 603:22-

23   608:9.  Rambus produced no documents reflecting this search.

24       147.    However, Rambus has produced various documents relating to the conception and

25   reduction to practice of the inventions described in the original '898 patent application filed in April

26   1990.  Trial Tr. 930:2-9.  These include inventor notes, Trial Tr. 932:24-933:15; 935:12-16; 1003:2-

27   23, computer simulations, Trial Tr. 1004:19-1005:19, drafts of patent applications, Trial Tr.

28   1045:22-1046:4 and technical presentations given by the inventors. Trial Tr. 1046:20-24.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    148.    In light of the availability of both inventors to thorough cross-examination, the

2 extent of the records that were available relating to conception and reduction to practice, and the fact

3 that invalidity issues depend almost entirely on the consideration of intrinsic evidence and publically

4 available information, it seems extremely unlikely that Rambus destroyed documents prepared by the

5 inventors that would have been of benefit to Hynix.

6           **4.    Prior Art Patents**

7    149.    Hynix suggests that Rambus may not have produced all the prior art patents it

8 considered.  Rambus has produced several boxes of prior art.  Trial Tr. 949:17-19.  The prior

9 patents produced by Rambus include prior art references with fax lines showing that the patents were

10 ordered in 1996, prior patents with a few portions underlined, and prior patents containing a few

11 other sorts of notations.  *Id.* at 1009:17-1022:13.  All the witnesses who testified with respect to prior

12 art confirmed that they had retained the prior art they considered and that they did not destroy it in

13 connection with the implementation of Rambus's Document Retention Policy.

14    150.    Jose Moniz began working on Rambus matters at Steinberg's law firm in Virginia in

15 January 1999.  Trial Tr. 1626:15-1627:3; 1628:7-12.  In late September or early October of 1999,

16 Moniz became a Rambus employee.  Trial Tr. 1626:10-12.

17    151.    As part of his duties while working for Steinberg in early 1999, Moniz conducted a

18 search for prior art relating to Rambus patent applications claiming priority to the original '898

19 application.  Trial Tr. 1629:12-25.

20    152.    Moniz obtained copies of any prior art he believed might be material to one or more

21 of Rambus's patent applications; this prior art was all submitted to the PTO.  Trial Tr. 1631:23-

22 1632:6; 1637:9-23.

23    153.    Moniz added copies of the prior art that he found in his search to a collection of prior

24 art that had already been gathered, and stored the combined collection in banker's boxes.  Trial Tr.

25 1632:7-18; 1638:16-25.

26    154.    When Moniz joined Rambus, the boxes of prior art that he had maintained in Virginia

27 were shipped to Rambus where Moniz continued to maintain them until two or three years ago when

28 they were turned over to the litigation group.  Trial Tr. 1639:15-25; 1658:5-9.

155.    The prior art collected by Moniz in 1999 does not appear to have been destroyed, and copies of that prior art were produced to Hynix in this litigation.  Trial Tr. 1641:13-1642:9; 1649:11-18; 1653:8-1658:4.

156.    Moniz and Steinberg testified that they may have discarded duplicate copies of prior art containing notes indicating which art related to which patent applications.  Trial Tr. 1452:1-8; 1454:23-1455:4; 1641:3-12.  Moniz also no longer has a spreadsheet, created and maintained while he was employed by Steinberg, logging the prior art collected for disclosure to the PTO.  Trial Tr. 1659:13-25.  However, the court finds that no information was lost because the substance of the notes and spreadsheet was preserved in the Information Disclosure Statements submitted to the PTO which show in which applications particular prior art reference were cited.  Trial Tr. 1481:7-1482:20; 1661:10-22.

157.    Despite the number of litigations pending in various forums involving the Farmwald/Horowitz family of patents, no party or patent counsel has found material prior art references that were omitted from the applications for the patents-at-issue.  *See* Trial Tr. 1786:24-1787:20.

158.    The court finds that Hynix had available to it all the prior art patent references considered by Rambus.

### 5.    Other Prior Art and Prosecution Materials

159.    There may have been tapes of meetings between the prosecuting attorneys and the inventors or notes of their communications kept by the prosecuting attorneys that were destroyed when BSTZ files were cleansed.  Trial Tr. 892:3-898:3.  In addition, draft patent claims and amendments, attorney notes and correspondence may have been discarded.  *See Hynix I*, 591 F. Supp. 2d at 1067; *see also Micron II*, 645 F.3d at 1318.  However, it appears that copies of the files for the claims-at-issue were provided to Rambus before they were cleaned.  FF 109.

160.    BSTZ apparently cleansed its files based upon its attorneys' understanding of "general professional knowledge" of what should be discarded and not based upon any instruction from Karp. Tr. Trial 904:19-904:24.

161.    BSTZ's general Rambus files, which contained Vincent's notes of his concern that

1   Rambus might be equitably estopped from asserting its patents because of its JEDEC membership,

2   were not destroyed.

3        162.    There is no way of knowing what materials that were kept by Rambus itself in its

4   prosecution files may have been destroyed.  However, it is highly unlikely that they contained any

5   invalidating prior art.  They may have contained information that showed that the ideas for the patent

6   amendments came from information learned at JEDEC meetings.

7        163.    Any non-privileged materials from prosecution files might have provided Hynix

8   with evidence relevant to its invalidity defenses.  However, given the evidence that is considered

9   with respect to those defenses, it is hard to even speculate as to what relevant evidence might have

10  been destroyed.  Obviousness turns on how one skilled in the art views the differences between the

11  claimed invention and the prior art.  The evidence is convincing that no prior art was destroyed.  The

12  written description defense depends on an analysis of intrinsic evidence, specifically whether the

13  specification has support for the amended claims.  Notes made by attorney Vincent regarding the

14  possible application of equitable estoppel were retained and produced; even if he made other notes

15  on that subject which were discarded, they most likely would have been cumulative.

16              **6.     Documents Relating to Negotiations with Intel**

17       164.    There is evidence that some documents relating to Rambus's negotiations with

18  Intel were discarded by Rambus.  Gary Harmon, Rambus's CFO, stated he was involved in Rambus's

19  negotiations with Intel in 1996, but "during the Karp retention purge, I destroyed everything

20  pertaining to these contracts."  HTX 331. Because he "followed the Karp 'scorched earth theory' of

21  document retention," he had only two documents left pertaining to the Intel contract negotiations.

22  HTX 330.

23       165.    Evidence of negotiations with Intel after 1996 might have shed light on when

24  Rambus first recognized the potential of Intel turning away from RDRAM and when Rambus made

25  definite decisions to go after manufacturers of SDRAM and "play [its] IP card." Micron II, 645 F.3d

26  at 1323.

27              **7.     Board Materials**

28       166.    There is substantial evidence that Rambus preserved Board presentations,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   including many presentations relied upon by Hynix. That Board presentations from 1998 were (and

2   would have been) preserved is consistent with the Document Retention Policy. HTX 023.002

3   ("Rambus keeps copies of other Board materials [in addition to minutes, which are permanently

4   retained] for no less than 3 years, but Rambus may choose to keep such materials longer.").

5   However, "[m]eeting minutes are kept only in final form as memorialized by the Rambus secretary

6   or designated officer." *Id.* It is, therefore, theoretically possible that drafts of the minutes may have

7   discussed some aspect of Rambus's business plans or intent not included in the adopted Board

8   Minutes and thus provided information relevant to Hynix's claims. However, the evidence provided

9   with respect to Board materials and presentations to the Board strongly supports the conclusion that

10  any Board materials that were destroyed would have provided cumulative information relevant to

11  that which was retained. The one exception would be notes or records pertaining to JEDEC. *See* FF

12  137.

13              **IV.  CONCLUSIONS OF LAW**

14       **A.       Issues on Remand**

15       The Federal Circuit has remanded to this court certain issues to be reconsidered under the

16  framework of *Micron II*, which affirmed a Delaware district court 's finding of spoliation in *Micron*

17  *I*. *Micron II*, 645 F.3d at 1321-22. Although it affirmed the spoliation finding, the Federal Circuit

18  vacated the district court's imposition of a dismissal sanction against Rambus, concluding that the

19  district court had not fully explained the factual underpinnings of its bad faith and prejudice

20  determinations. *Id*. at 1328. The Circuit clarified the applicable legal standards and then remanded

21  so that the district court could reconsider its bad faith and prejudice determinations, as well as the

22  appropriate sanction, if any, for Rambus's conduct. *Id*.

23       In *Hynix I*, this court determined that Rambus had not engaged in unlawful spoliation of

24  evidence, and that Hynix had not established its unclean hands defense because the record did not

25  support a finding that Rambus had destroyed evidence in bad faith or that Hynix had been prejudiced

26  by the destruction of evidence. The Federal Circuit has directed this court to reconsider the question

27  of whether Rambus spoliated evidence and, if so, the appropriate remedy, if any. *Hynix II*, 645 F.3d

28  at 1341. The Federal Circuit did not reach this court's determinations on bad faith and prejudice. *Id*.

1    at 1347 n.2.  Read together, *Hynix II* and *Micron II* suggest that the bad faith and prejudice elements

2    of the unclean hands defense are similar, if not identical, to the equitable factors that a court must

3    find before it can dismiss a case under its inherent powers for spoliation.  The decisions also suggest

4    that this court may view the issues of bad faith and prejudice differently when  it analyzes spoliation

5    under the framework of *Micron II*, without the "immediacy gloss" that this court improperly placed

6    on the "reasonably foreseeable" standard in *Hynix I*.  *See Hynix II*, 645 F.3d at 1347 and n.2.

7         As a preliminary matter, the court will analyze the question of whether any of the findings

8    made in *Micron I* and affirmed in *Micron II* should be given preclusive effect in this case and, if so,

9    the extent of such preclusion.  The court will then analyze the issue of whether Rambus destroyed

10   records at a time when litigation was reasonably foreseeable.  If so, the court will determine whether

11   Rambus acted in bad faith.  Next, the court will determine the nature and extent of any prejudice

12   suffered by Hynix as a result of the spoliation.  Finally, the court will decide what sanction is

13   appropriate, if any.

14        The court's view of the case has changed significantly since it issued its *Hynix I* decision.

15   The reasons for this change include the following:  (1) this court "applied too narrow a standard of

16   foreseeability in determining that litigation was not reasonably foreseeable until late 1999," *Hynix II*,

17   645 F.3d at 1341; (2) application of the correct standard of reasonable foreseeability to the

18   circumstances "compel[s] a finding that litigation was reasonably foreseeable prior to Rambus's

19   Second Shred Day," *id.* at 1347; (3) evidence not presented to this court in *Hynix I* suggests that

20   Rambus employees may have been encouraged to dispose of harmful documents; and (4) this court's

21   thorough reconsideration of the record persuades it that the evidence of spoliation in that record is

22   stronger than it concluded in *Hynix I,* particularly with respect to whether litigation against

23   manufacturers of non-compatible DRAM was only a back-up strategy to licensing RDRAM.

**B.    Preclusive Effect of *Micron II* Decision**

**1.    Discretion to Apply Collateral Estoppel**

26        The Federal Circuit left for this court to decide "whether the *Micron II* decision should be

27   given any preclusive effect."  *Hynix II*, 645 F.3d at 1347 n.2.  At the case management conference on

28   October 21, 2011, the court stated its tentative view that collateral estoppel should not be applied but

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   indicated that it would reexamine the issue.  Dkt. # 4078 at 33:3-13.  The court has reconsidered the

2   issue and concludes that under the changed circumstances that now exist, the *Micron II* decision

3   should be given preclusive effect with respect to the issues of when Rambus's duty to preserve began

4   and whether Rambus spoliated documents.  However, preclusive effect should not extend to the

5   issues of bad faith, prejudice or appropriate sanction.

6          Hynix contends that it seeks to assert "defensive" nonmutual collateral estoppel, and that

7   application of the doctrine in the defensive context is mandatory.  Hynix unsuccessfully argued this

8   precise position in connection with its motion for summary judgment following the Delaware district

9   court's issuance of its findings of fact and conclusions of law in *Micron I.  See Hynix Semiconductor,*

10  *Inc. v. Rambus, Inc.*, No. C-00-20905 RMW, 2009 WL 292205, at *4 (N.D. Cal. Feb.3, 2009) ("'09

11  Coll. Estop. Order").  In rejecting Hynix's argument, this court observed that "there is no intrinsic

12  difference between 'offensive' as distinct from 'defensive' issue preclusion, although a stronger

13  showing that the prior opportunity to litigate was adequate may be required in the former situation

14  than in the latter."  *Id.* (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 n.16 (1979)

15  (internal quotation marks and citation omitted)).  Moreover, the Supreme Court's first endorsement

16  of "defensive" collateral estoppel emphasized the need for careful, equitable application of the

17  doctrine.  *See Blonder-Tongue Labs., Inc.  v.  Univ.  of Illinois Foundation*, 402 U.S. 313, 334

18  (1971).

19         Hynix has not cited, nor has the court located, any binding authority holding that application

20  of  "defensive" nonmutual collateral estoppel is mandatory.  The Bankruptcy Appellate Panel of the

21  Ninth Circuit has held in an unpublished decision that "under Colorado law the application of

22  defensive preclusion is mandatory."  *In re Gordon*, BAP Case No. CC-10-1357-DKiPa, 2011 WL

23  3300926, at *6 (9th Cir. BAP 2011).  This decision does not control in the present case, which does

24  not involve Colorado law.  Moreover, the Colorado appellate court decision cited by the BAP does

25  not state that application of defensive preclusion is "mandatory," but rather that "[a] court's discretion

26  to refuse to apply defensive nonmutual collateral estoppel is highly circumscribed."  *Central Bank*

27  *Denver, NA v. Menaffy, Rider, Windholz & Wilson*, 940 P.2d 1097, 1102  (1997).  One decision of

28  the District Court for the Northern District of Texas has held that "[t]he application of defensive

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   collateral estoppel is mandatory when the requirements have been met."  *Ackerman v. American*

2   *Airlines, Inc.*, 924 F. Supp. 749, 753 (N.D. Tex. 1995).  That decision relied upon *Parklane* and

3   *Montana v. United States*, 440 U.S. 147 (1979), neither of which holds expressly that a district court

4   lacks discretion in the application of defensive collateral estoppel.  *See Ackerman*, 924 F. Supp. at

5   753.

6          Moreover, as this court has recognized, party characterizations are tricky in declaratory

7   judgment actions.  *See* '09 Coll. Estop. Order at *2.  While Hynix argues that it is in the position of a

8   defendant with respect to Rambus's patent infringement claims, Hynix glosses over the fact that *it*

9   sued Rambus for declaratory judgment in this forum.  Arguably, then, Rambus should be viewed as

10  the defendant, and Hynix's assertion of issue preclusion should be viewed as offensive rather than

11  defensive.  Rambus did not choose the time, venue, or adversary; instead, Rambus was forced to

12  raise patent infringement allegations in its counterclaims to the *Hynix* and *Micron* complaints, and to

13  litigate those counterclaims on dual fronts.  *See id*.  Thus, even if application of collateral estoppel

14  were mandatory in the defensive context, Hynix's assertion of the doctrine properly could be

15  considered offensive, or at least quasi-offensive, in this case.  There is no question that a district

16  court has "broad discretion" whether to apply offensive nonmutual issue preclusion.  *See Parklane*,

17  439 U.S. at 331.

18         The court believes that it was correct in concluding that it has discretion whether to apply the

19  collateral estoppel doctrine to issues decided in *Micron I* and affirmed in *Micron II*.  '09 Coll. Estop.

20  Order.

21                    **2.       Exercise of Discretion**

22         The cases expressly addressing a court's discretion to apply nonmutual collateral estoppel

23  have arisen in the offensive context.  Factors that a court may consider when deciding whether to

24  apply offensive nonmutual issue preclusion include:  (1) whether the plaintiff in the second action

25  easily could have joined in the first action; (2) whether the defendant had incentive to litigate the first

26  action "fully and vigorously";  (3) whether the judgment relied upon is consistent with other prior

27  judgments; and (4) whether the second suit would afford the defendant more advantageous

28  procedural opportunities than those afforded in the first suit.  *See Parklane*, 439 U.S. at 331-32; *see*

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  *also In re: Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004) (listing same factors).

2       As is noted above, this court previously declined to exercise its discretion to apply issue

3  preclusion when Hynix in essence asked this court to replace its findings of fact and conclusions of

4  law with those made in *Micron I*.  This court observed that application of issue preclusion "rests on

5  an assumption that a prior decision was more or less correct," and then concluded that such an

6  assumption was unwarranted given the inconsistencies between its decision and that of the Delaware

7  court.  '09 Coll. Estop. Order at *4 (citing *Crawford v. Ranger Ins. Co.*, 653 F.2d 1248, 1252 (9th

8  Cir. 1981)).  The court also considered the fact that applying the doctrine would not promote judicial

9  efficiency because the spoliation and related issues already had been litigated fully in both California

10  and Delaware.  *Id.* at *5-6.  Based upon the record then before it, this court concluded that justice

11  and equity would not be served by permitting Hynix to rely on the *Micron I* decision.

12       However, circumstances have changed significantly since the court engaged in that analysis.

13  This court's finding that Rambus did not spoliate evidence has been vacated, while the Delaware

14  court's *Micron I* decision to the contrary has been affirmed.  As a result, this court no longer is

15  confronted with two inconsistent decisions.  Rather, the slate has been wiped clean in the present

16  action while the spoliation issue has been finally adjudicated in *Micron I*.  This court no longer has

17  grounds for questioning whether the *Micron I* determination of spoliation is correct.  Most

18  importantly, that spoliation finding has been expressly affirmed by the Federal Circuit.  *Micron II*,

19  645 F.3d at 1325-26.  Additionally, in its opinion remanding *Hynix I,* the Federal Circuit

20  unequivocally stated that "[a]pplying the correct standard of reasonable foreseeability . . . litigation

21  was reasonably foreseeable prior to Rambus's Second Shred Day."  *Hynix II*, 645 F.3d at 1347.

22  Given this statement by the Federal Circuit, it is difficult to see how this court could do other than

23  find that Rambus spoliated evidence, particularly in light of the Federal Circuit's observation that

24  Rambus had conceded that "the two cases should not be decided differently," *id.*, and that this court

25  is "the only court to determine that the duty to preserve documents did not begin until after Rambus's

26  second shred day," *id.* at 1346.

27       In addition, Rambus had every incentive to litigate the issue before the Delaware court.

28  Finally, the present suit does not offer Rambus any procedural safeguards that were unavailable in

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    the Delaware court.  All of these factors weigh heavily toward applying collateral estoppel to

2    preclude Rambus from relitigating the spoliation issue in this court.

3            There do remain considerations that weigh against issue preclusion, specifically, that Hynix

4    could have joined in the *Micron I* action and the fact that issue preclusion will not result in any

5    significant judicial economy given that both cases have been litigated fully, appealed, and remanded.

6    The forum selection gamesmanship engaged in by Hynix and Micron is troubling.  The Supreme

7    Court has disapproved of litigation strategies that permit a party to "wait and see" whether an earlier

8    action will result in a favorable judgment.  *See Parklane*, 439 U.S. at 330.  However, this fact is

9    insufficient to outweigh all the other factors favoring issue preclusion as to spoliation.  With respect

10   to judicial efficiency, collateral estoppel may be appropriate even when both actions have been

11   litigated.  For example, in *Blonder-Tongue*, a patent that was held invalid following a bench trial in

12   one action subsequently was held valid following a bench trial in a second action.  *Blonder-Tongue*,

13   402 U.S. at 315-16.  Both decisions were affirmed, by the Eighth and Seventh Circuits, respectively.

14   *Id*.  On petition for certiorari, the Supreme Court *sua sponte* directed the parties to brief the

15   applicability of preclusion principles.  *Id*. at 317.  The Court concluded that a strict mutuality

16   requirement was not warranted, and remanded for further proceedings in light of the new guidelines

17   for preclusion set forth in its opinion.  *Id*. at 350.  The Court issued its remand order despite the fact

18   that an apparently full and fair second trial already had been had on the merits of the validity

19   question.  On remand, the district court applied issue preclusion to prevent the patentee from

20   relitigating the invalidity determination reached in the first case.  *See Univ. of Ill Found. v. Blonder-*

21   *Tongue Labs., Inc.*, 334 F. Supp. 47 (D.C. Ill. 1971), *aff'd by* 465 F.2d 380 (7th Cir. 1972), *cert.*

22   *denied by* 409 U.S. 1061 (1972).  Thus, although judicial efficiency is one of the purposes underlying

23   the collateral estoppel doctrine, *Blonder-Tongue*, 402 U.S. at 328-29, the fact that an action has been

24   fully litigated does not bar application of the doctrine.  Accordingly, the circumstances that now exist

25   persuade the court that preclusive effect should be given to the *Micron I* determination, as affirmed

26

27

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  by the Federal Circuit, that Rambus spoliated evidence prior to the second shred day.[7]

2       **C.**    **Scope of Collateral Estoppel**

3       The court applies the doctrine of collateral estoppel only with respect to the finding of

4  spoliation.  Hynix argues that the doctrine should preclude consideration of 103 "findings and

5  conclusions" that Hynix asserts have been established by *Micron II*.  *See* Dkt. # 4066-1 (Exh. A to

6  Hynix's Op. Br. on Remand).  "Issue preclusion bars successive litigation of 'an issue of fact or law'

7  that 'is actually litigated and determined by a valid and final judgment, and . . . is essential to the

8  judgment.'" *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (quoting *Restatement (Second) of Judgments* §

9  27 (1980)).  "If a judgment does not depend on a given determination, relitigation of that

10  determination is not precluded." *Id.*  "A determination ranks as necessary or essential only when the

11  final outcome hinges on it." *Id.* at 835.  It is insufficient that the issue of fact or law in question be

12  "supportive of" the judgment. *See In re: Microsoft*, 355 F.3d at 327-28 (reversing district court's

13  ruling that collateral estoppel precluded relitigation of 350 factual findings made in connection with

14  a prior judgment).  The bulk of the 103 findings and conclusions listed by Hynix are not necessary or

15  essential to the spoliation determination that was affirmed by *Micron II*.

16       **D.**    **Whether Litigation Was Foreseeable Under the Framework of *Micron II***

17       **1.**    **Framework for Determining Spoliation**

18       Application of the collateral estoppel doctrine establishes that litigation was reasonably

19  foreseeable prior to Shred Day 1999, and thus that destruction of documents during Shred Day 1999

20  and thereafter constituted spoliation.  After reconsidering the record in this case under the framework

21  set forth in *Micron II*, this court concludes that in fact litigation was reasonably foreseeable prior to

22  Shred Day 1998, and thus that destruction of documents during Shred Days 1998, 1999 and 2000

23  constituted spoliation.

24       Spoliation occurs when one destroys or materially alters evidence or fails to preserve property

25

26         [7]     There is no dispute that the four requirements for issue preclusion are met with respect to spoliation:  (1) Rambus had a full and fair opportunity to litigate the issue of spoliation in

27  the *Micron* action; (2) the spoliation issue actually was litigated in *Micron*; (3) the issue was decided adversely to Rambus as a result of a final judgment in *Micron I*; and (4) Rambus was a party in the

28  *Micron I* action. *See Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1050 (9th Cir.  2008) (listing elements).

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   for another's use as evidence in pending or reasonably foreseeable litigation. *Micron II*, 645 F.3d at

2   1320 (*citing Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)); *see also Reeves v.*

3   *MV Transp., Inc.*, 186 Cal. App. 4th 666, 681 (2010).  However, destruction of documents which

4   would have been relevant in later litigation is not wrongful unless that litigation was reasonably

5   foreseeable at the time of destruction. *Id*.  The Federal Circuit acknowledged in *Micron II* that

6   legitimate document retention policies are created in part to keep adverse information from getting

7   into the hands of others and are common in business. *Id.* at 1319-1320 (citing *Arthur Andersen LLP*

8   *v. United States*, 544 U.S. 696, 704 (2005)).  It is not wrongful for a manager to instruct employees

9   to comply with a valid document retention policy under ordinary circumstances. *Id*.

10          As set forth above, the Federal Circuit held that this court in its *Hynix I* decision used an

11   overly narrow standard in determining whether Rambus reasonably foresaw litigation when it

12   destroyed documents. *Hynix II,* 645 F.3d at 1341. The Federal Circuit concluded that this court

13   placed an inappropriate gloss on the standard, requiring that litigation be "imminent, or probable

14   without significant contingencies." *Id.* at 1345; *see Micron II*, 645 F.3d at 1320. The application of

15   an inappropriate gloss is evident for three reasons: (1) this court did not discuss that the resolution of

16   certain contingencies to instituting litigation were reasonably foreseeable; (2) this court erroneously

17   relied upon the fact that Rambus had not budgeted for or received Board approval for instituting

18   litigation against DRAM manufacturers as demonstrating a lack of reasonable foreseeability; and (3)

19   this court was the only one of four courts that had considered the issue to determine that the duty to

20   preserve documents did not arise until after the second shred day. *See Hynix II*, 465 F.3d at 1345-46.

21              **2.      Federal Circuit Holds that Duty to Preserve Arose Prior to Second Shred**
                         **Day (August 26, 1999)**
22

23          The Federal Circuit concluded in *Hynix II* that "[a]pplying the correct standard of

24   reasonable foreseeability, without the immediacy gloss, these considerations compel a finding that

25   litigation was reasonably foreseeable prior to Rambus's Second Shred Day." *Id.* at 1347.

26              **3.      Rambus Degaussing of E-Mail Back-Up Tapes in July 1998**

27          Although the Federal Circuit held that the facts compelled a finding that litigation was

28   reasonably foreseeable prior to Shred Day 1999, which occurred on August 26, 1999, it did not

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    suggest a specific date before August 26, 1999 on which the duty to preserve arose.  The *Micron I*

2    court found the obligation arose in December 1998.  *Micron I*, 233 F.R.D. at 150.  The important

3    question, however, is not when the duty actually arose but rather the binary question of whether

4    litigation was reasonably foreseeable by the date on which documents were destroyed.  *Micron II*,

5    465 F.3d at 1322.  The first destruction of records was the erasing of back-up tapes in July 1998.

6    Although whether litigation was reasonably foreseeable at that time is a close question, the court

7    finds that it was not.

8           In early 1998, Rambus, a prosperous company with no document retention policy or

9    document control, had a legitimate interest in instituting and implementing a document

10   retention/destruction policy such as the one recommended by the Cooley lawyers.  The participants

11   in the DRAM industry were notoriously litigious.  Rambus was going to be licensing its technology

12   and the company needed to be able to respond efficiently to discovery in its own future infringement

13   actions, in litigation against it brought by others and in response to subpoenas in third-party

14   litigation.  In the early part of 1998, outside counsel Johnson warned Rambus that e-mail was

15   discoverable and that Rambus needed to be "battle ready"; specifically, it needed a licensing and

16   litigation strategy, including a document retention policy and a discovery database.  Rambus also

17   needed to conform its attorney's files on issued patents to those which were in the PTO.  Although

18   the document retention program that Rambus was developing in early 1998 was designed, in part, to

19   put it in shape to efficiently license and litigate, if necessary, Rambus had not focused in the first few

20   months of 1998 on instituting specific litigation such that litigation could have been considered

21   reasonably foreseeable.

22          Between March 1998 and the degaussing of the back-up tapes in July 1998, several

23   developments took place that made litigation more likely.  In March 1998, Karp presented to the

24   Board his strategic licensing and litigation strategy, including demanding a 5% royalty for SDRAM.

25   The strategy had been prepared pursuant to Tate's directive to Karp to develop a licensing and

26   litigation strategy.  In April 1998 Tate met with an Intel executive and was told that Intel was

27   "basically going to compete with [Rambus] on [the] next generation [of DRAM]."  *Hynix II*, 645

28   F.3d at 1343.  In May 1998, Karp met with representatives of the four operating divisions of Rambus

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  to decide on a policy for limiting the time that back-up tapes would be retained.  He also advised that

2  he was going to implement a company-wide document retention policy.  In a second quarter report,

3  Karp described implementing the document retention policy as a top level litigation goal.  "The

4  implementation of a document retention policy as an important component of a litigation strategy

5  makes it more likely that litigation was reasonably foreseeable." *Micron II,* 465 F.3d at 1322.  The

6  back-up tapes were degaussed on or before July 21, 1998.

7      As of the time of the destruction of the back-up tapes, however, there remained unanswered

8  questions about the potential success of RDRAM and the advisability and risks of Rambus bringing

9  suit against any of its RDRAM licensees who were also manufacturing SDRAM.  Karp and Roberts

10  had questions about whether Rambus's existing patents covered SDRAM or DDR SDRAM features.

11  None of Rambus's patent applications seeking patents covering SDRAM or DDR specifications had

12  issued.  Management had not discussed budgeting for litigation in any depth.  There had been only

13  some very hypothetical discussions about potential targets of litigation.  Although the possibility that

14  Rambus would need to institute litigation was on the minds of Karp and Tate, the court concludes

15  that litigation was not reasonably foreseeable at the time the tapes were destroyed in July 1998.  The

16  tape destruction was carried out at Johnson's recommendation primarily as a housekeeping measure

17  and to minimize the expense of complying with discovery requests in any litigation in which Rambus

18  might become involved..

19                **4.     Rambus Spoliated Documents on Shred Days**

20      However, the evidence establishes that before Shred Day 1998, Rambus anticipated

21  instituting litigation against one or more non-compatible manufacturers.  In the latter part of July

22  1998, Karp had advised Rambus's employees on the Document Retention Policy.  The fact that he

23  advised them to discard documents that questioned the patentability of ideas suggests he had

24  litigation on his mind.  In addition, Rambus was trying to get out of the "other DRAM" provision of

25  the Hyundai license agreement so that the scope of its license with Hynix would be limited to

26  RDRAM technology, thus clearing the way to sue Hynix for infringement for making the competing

27  SDRAM or SLDRAM.  As noted above, in April 1998 Tate had learned from an Intel executive that

28  Intel would be competing with Rambus on next generation DRAM.  After April 1998 Rambus

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   became increasingly concerned about its relationship with Intel and the lack of production of

2   RDRAM by the manufacturers.

3        In August 1998, Steinberg was hired by Rambus as outside counsel and was assigned in

4   October to pursue patent applications that would cover SDRAM features.  Rambus had concluded

5   that BSTZ was not pursing patent coverage for SDRAM features with the diligence that Rambus

6   wanted.  Tate, in fact, was disappointed that Karp had not done more to get SDRAM patent coverage

7   during his first year at Rambus.  Tate viewed this as Karp's most important job.  Karp and Tate

8   looked at obtaining coverage of SDRAM, DDR and SLDRAM as a top priority.

9        Although the first patent-at-issue was not granted until June 22, 1999, by Shred Day 1998

10  attorney Steinberg was about to become heavily involved in the prosecution of applications covering

11  SDRAM standards which Rambus anticipated it would obtain, Karp and Tate had designated such

12  coverage as a top priority, a litigation strategy was being aggressively developed that included

13  document destruction as an essential component, and concern about Intel and manufacturers turning

14  away from RDRAM was increasing.  These facts, among others, strongly suggest that Rambus had

15  decided, regardless of the success of RDRAM, to sue one or more SDRAM manufacturers not only

16  to protect its interest in RDRAM but also to gain a return on the patents it had applied for to cover

17  SDRAM standards.  Thus litigation was reasonably foreseeable at least by Shred Day 1998.  Because

18  litigation was reasonably foreseeable under the framework of *Micron II* by Shred Day 1998, Rambus

19  engaged in spoliation of evidence when it engaged in the destruction of documents on all three Shred

20  days.

21       **E.    Bad Faith**

22       The "unclean hands doctrine" may provide a complete defense if the party asserting a claim

23  has acted in bad faith relative to the matter for which it seeks relief.  *Jarrow Formulas, Inc. v.*

24  *Nutrition Now, Inc.*, 304 F.3d 829, 841-42 (9th Cir. 2002); *Fireboard Paper Products Corp.*, 227

25  Cal. App. 2d 675, 726-29 (1964).  The bad faith or inequitable conduct must relate directly to the

26  subject matter of the claim, *Jarrow*, 304 F.3d at 841; *Fireboard*, 227 Cal. App. 2d at 729, and the

27  party asserting the defense must have been prejudiced by the bad faith conduct, *see Dream Games of*

28  *Ariz. Inc. v. PC Onsite*, 561 F.3d 983, 990 (9th Cir. 2009).  To find bad faith in the spoliation

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

53

1   context, "the district court must find that the spoliating party 'intended to impair the ability of the

2   potential defendant to defend itself.'"  *Micron II*, 645 F.3d at 1326 (quoting *Schmid v. Milwaukee*

3   *Elec. Tool Corp.*, 13 F.3d 76, 80 (3rd Cir. 1994)).  "The fundamental element of bad faith spoliation

4   is advantage-seeking behavior by the party with superior access to information necessary for the

5   proper administration of justice."  *Id*.  To justify dismissal as a sanction, bad faith must be shown by

6   clear and convincing evidence.  *Id*. at 1328-29; *see also Carpet Seaming Tape Licensing Corp. v.*

7   *Best Seam Inc.*, 694 F.2d 570, 578 (9th Cir. 1982).

8          Both Hynix and Rambus assert that the evidence, which is in large part undisputed, supports

9   only one reasonable conclusion, but they disagree as to what that conclusion is.  Rambus argues that

10  the evidence shows that it disposed of documents in good faith pursuant to a neutral Document

11  Retention Policy.  Hynix contends that the evidence establishes that Rambus acted in bad faith by

12  intentionally spoliating documents to gain a litigation advantage.

13         Rambus supports its position by pointing out that its Document Retention Policy as written

14  was content neutral and based upon a generic, industry standard template that Cooley provided and

15  had used with other clients.  Rambus was alerted to the need for a document retention policy by

16  attorney Johnson.  As Johnson explained, Rambus was an approximately eight to nine year-old start-

17  up with no document control policy in place to deal with the numerous documents that had been

18  generated since the company's inception.  Johnson believed that a document control policy would

19  reduce the expense of retrieving electronic data stored on obsolete or corrupted back-up media,

20  reduce search costs in the event that Rambus was someday required to respond to subpoenas or

21  document requests, and avoid claims of spoliation which could result from the lack of a policy

22  dictating what documents should be retained.  There is no evidence that Johnson knew of any

23  particular documents that would actually be damaging to Rambus if it should engage in patent

24  infringement litigation at some time in the future.  He was concerned generally about retaining e-

25  mails for more than a short of period of time, and he feared that encouraging engineers to look for

26

27

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  documents to keep would result in too much retention because engineers tended to be "pack rats."[8]

2        Karp, who drafted and implemented the policy at Rambus, essentially adopted the contents of

3  the Cooley template and did not change its content neutral nature.  The policy dealt with a wide

4  variety of records and was not limited to patent-related documents.  It does not appear that Karp

5  actually knew of particular documents that would be helpful to any non-compatible manufacturer

6  Rambus intended to sue.  However, he did have a general concern about the content of the records

7  Rambus had accumulated and did suggest that any materials questioning the patentability of ideas be

8  discarded.

9        Rambus disseminated its Document Retention Policy openly and broadly throughout the

10 company, making presentations to both managers and other employees.  Such openness about the

11 process seems inconsistent with knowing destruction of documents in violation of a duty to maintain

12 them.  If Karp in fact requested that employees destroy potentially damaging evidence, it is

13 surprising that there was not a single whistle blower out of the approximately 145 and 165

14 employees participating in Shred Days 1998 and 1999, respectively.  In fact, if Rambus did intend to

15 destroy all damaging documents, it did a poor job.  A number of documents damaging to Rambus

16 were retained and were produced to Hynix in discovery, for example, notes expressing concern that

17 equitable estoppel might apply because of JEDEC membership and documents showing that Rambus

18 amended patent claims based upon information that Crisp obtained at JEDEC meetings.

19       Hynix asserts that Rambus's Document Retention Policy was implemented as part of

20 Rambus's litigation plan and to get "battle ready."  "The implementation of a document retention

21 policy as an important component of a litigation strategy makes it more likely that litigation was

22 reasonably foreseeable." *Micron II,* 465 F.3d at 1322.  Hynix contends that by Shred Day 1998,

23 Rambus was already obligated to retain relevant and material documents, and therefore was guilty of

24 spoliation regardless of whether the documents were disposed of pursuant to the Document

25

26

27

28

---

[8]      Although Johnson had some awareness of Rambus's intent to file suit against DRAM manufacturers, he may not have been informed of facts that would have alerted him that litigation had become reasonably foreseeable.  His involvement with Rambus was sporadic after he helped present the Document Retention Policy.  Rambus has not asserted an advice of counsel defense, probably because it realizes that it had not made full disclosure to Johnson about its litigation plans.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   Retention Policy.  Hynix points out that Johnson had advised Rambus that a document retention

2   policy could not be implemented at a time when litigation was anticipated.

3          Hynix further contends that Karp selectively implemented the policy because he advised the

4   Rambus staff of the importance of keeping documents that showed proof of invention and instructed

5   them to dispose of documents that questioned the patentability of an idea.  The Document Retention

6   Policy stated that "documents related to patent disclosures and proof of invention dates are of great

7   value to Rambus and should be kept permanently."  HTX 023.001.  This language tracks Cooley's

8   generic template which reads in part: "laboratory and development documents are often subject to

9   intellectual property protection in their final form (e.g. patents and copyrights). . . .  The Company

10  should keep all laboratory and development notebooks and documents in a central location with

11  restricted access. . . ."  RTX 091 at 6.  Karp's instruction does not suggest selective enforcement.  For

12  example, he did not instruct the employees to keep only records showing a favorable conception

13  date.  Viewing the record as a whole, it appears that Karp's instruction was consistent with Cooley's

14  industry standard template and Rambus's Document Retention Policy.

15         It is not entirely clear what Karp meant by his comment that documents questioning

16  patentability of an idea should not be kept.  There is no evidence that Karp knew of notes or other

17  documents questioning the patentability of an idea; rather, he seemed to be concerned about stray

18  remarks.  However, it does appear that he was concerned that such stray remarks could cause

19  difficulties in litigation.  His instruction regarding documents questioning patentability of ideas was

20  selective in a manner not called for by the written Document Retention Policy.

21         The classic case of bad faith is one where the litigant intentionally destroys documents for the

22  purpose of hiding adverse information.  *Micron II*, 645 F.3d at 1326.  The evidence does not show

23  that Rambus knowingly destroyed damaging evidence.  However, it engaged in massive destructions

24  of records in what its CFO described as the "Karp document retention purge" and Karp's "scorched

25  earth" theory of document retention.  HTX 330; HTX 331.  Rambus kept no record of the documents

26  that were shredded and made no effort to retain documents that were potentially relevant to its

27  foreseeable litigation with non-compatible DRAM manufacturers.  "[A] corporation cannot blindly

28  destroy documents and expect to be shielded by a seemingly innocuous document retention policy."

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   *Lewy v. Remington Arms Co., Inc.*, 836 F.2d 1104, 1112 (8th Cir. 1988).  Under governing Ninth

2   Circuit law,[9] willful spoliation is treated the same as bad faith spoliation insofar as it may justify

3   dismissal and places the burden on the spoliator to show that its adversary was not prejudiced.  *Leon*

4   *v. IDX Systems Corp.*, 464 F.3d 951, 959-60 (9th Cir. 2006).  Under *Leon*, "[a] party's destruction of

5   evidence qualifies as willful spoliation if the party has 'some notice that the documents were

6   potentially relevant to the litigation before they were destroyed.'" *Id.* at 959 (quoting *United States v.*

7   *Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)).

8           Although the evidence does not support a conclusion that Rambus deliberately shredded

9   documents it knew to be damaging, the court concludes that Rambus nonetheless spoliated evidence

10  in bad faith or at least willfully.  This conclusion is based upon the facts that:  (1) Rambus destroyed

11  records when litigation was reasonably foreseeable; (2) Karp, the officer in charge of the destruction,

12  was experienced in litigation and undoubtedly knew that relevant documents should not be destroyed

13  when litigation is reasonably foreseeable; (3) the destruction was part of a litigation plan; (4) one of

14  the motives of the destruction was to dispose of potentially harmful documents; and (5) Rambus

15  shredded a huge number of documents without keeping any records of what it was destroying.

16          **F.      Prejudice**

17                  **1.      Standard for Demonstrating Prejudice**

18          In *Micron II*, the Federal Circuit set forth the standard applicable to demonstrating prejudice

19  arising from spoliation of evidence.  "'Prejudice to the opposing party requires a showing that the

20  spoliation 'materially affect[s] the substantial rights of the adverse party and is prejudicial to the

21  presentation of his case.'"  *Micron II*, 645 F.3d at 1328 (quoting *Wilson v. Volkswagen of Am., Inc.*,

22  561 F.2d 494, 504 (4th Cir. 1977)) (alteration in original).  "In satisfying that burden, a party must

23  only 'come forward with plausible, concrete *suggestions* as to what [the destroyed] evidence *might*

24  *have been*.'"  *Id.* (quoting *Schmid*, 13 F.3d at 80) (alteration and emphasis in original).  "If it is shown

25  that the spoliator acted in bad faith, the spoliator bears the 'heavy burden' to show a lack of prejudice

26  to the opposing party because '[a] party who is guilty of . . . intentionally shredding documents . . .

27

28          [9]      The Federal Circuit reviews the district court's spoliation decision under
        the law of the regional circuit.  *Hynix II*, 645 F.3d at 1345.

1 should not easily be able to excuse the misconduct by claiming that the vanished documents were of

2 minimal import.'" *Id*. (quoting *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925 (1st Cir.1988)).

3       In *Anderson*, the case from which the Federal Circuit drew the "heavy burden" language, the

4 plaintiff sought relief from an adverse judgment on the basis that the defendant had withheld

5 discoverable evidence.  In the course of addressing the standards appropriate to intentional versus

6 accidental nondisclosure, the appellate court opined that "[a] party who is guilty of, say, intentionally

7 shredding documents in order to stymie the opposition, should not easily be able to excuse the

8 misconduct by claiming that the vanished documents were of minimal import."  *Anderson*, 862 F.2d

9 at 925.  The court determined that such conduct must give rise to a presumption that the spoliation

10 caused prejudice to the adverse party, rebuttable only "by clear and convincing evidence

11 demonstrating that the withheld material was in fact inconsequential."  *Id*.  While recognizing "the

12 stringency of this standard," the court concluded that "[w]ithout the imposition of a heavy burden

13 such as the 'clear and convincing' standard, spoliators would almost certainly benefit from having

14 destroyed the documents, since the opposing party could probably muster little evidence concerning

15 the value of papers it never saw."  *Id*.  The court went on to state that, "[a]s between guilty and

16 innocent parties, the difficulties created by the absence of evidence should fall squarely upon the

17 former."  *Id*.  This reasoning is consistent with *Leon*, which holds that "because the relevance of . . .

18 [destroyed] documents cannot be clearly ascertained because the documents no longer exist, a party

19 can hardly assert any presumption of irrelevance as to the destroyed documents."  *Leon*, 464 F.3d at

20 959 (internal quotation marks and citation omitted) (alterations in original).

21       The alleged misconduct by the spoliator, however, must relate directly to an issue concerning

22 which the complaint is made.  The Supreme Court has explained that courts

23       do not close their doors because of plaintiff's misconduct, whatever its character, that
        has no relation to anything involved in the suit, but only for such violations of
24       conscience as in some measure affect the equitable relations between the parties in
        respect of something brought before the court for adjudication.
25

26 *Keystone Driller Co.*, 290 U.S. 240, 245-46 (1933); *see also Jarrow Formulas*, 304 F.3d at 841

27 ("[U]nclean hands does not constitute 'misconduct in the abstract, unrelated to the claim to which it

28 is asserted as a defense.'") (quoting *Republic Molding Corp. v. B.W. Photo Utilities*, 319 F.2d 347,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1   349 (9th Cir. 1963)); *United States v. United Energy Corp.*, 1987 WL 4787, at *13 (N.D. Cal. Feb.

2   25, 1987) (requiring "direct nexus" between alleged misconduct and claims at issue in litigation).

### 2.   Invalidity Defenses

4       Hynix has not come forward with plausible, concrete suggestions as to what destroyed

5   documents might have been helpful to the assertion of an invalidity defense.  The potentially

6   destroyed evidence must have had a nexus to the potential success of one or more of Hynix's

7   defenses.  As noted in *Micron I*,

8           The defenses that do not seem likely to depend from evidence internal to Rambus
            include those of anticipation and obviousness, since prior art references (by
9           definition) must be publicly available.  Likewise, the written description requirement
            involves an objective review of the patent to determine whether it communicates that
10          which is necessary to enable the skilled artisan to make and use the claimed invention.

11  *Micron I*, 233 F.R.D. at 151 n.59.  This court agrees.  The invalidity defenses of anticipation and

12  obviousness depend upon how one of ordinary skill in the art would have understood the prior art.

13  To anticipate a claim under 35 U.S.C. § 102, a single prior art reference must expressly or inherently

14  disclose each claim limitation.  *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1334-35 (Fed.

15  Cir. 2008).  The defense of obviousness provides that "[a] patent may not be obtained . . . if the

16  differences between the subject matter sought to be patented and the prior art are such that the

17  subject matter as a whole would have been obvious at the time the invention was made to a person

18  having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. 103(a).  Because

19  this court has found that Hynix had access to all the prior art, Hynix could not have been prejudiced

20  in its assertion of its defenses of invalidity for anticipation or obviousness.

21      The defense of an inadequate written description depends on a showing that the specification

22  and drawings would not have conveyed to those skilled in the art that at the time the specification

23  was filed the inventor was in possession of what is in the claims.  *Ariad Pharms, Inc. v. Eli Lily &*

24  *Co.*, 598 F.3d 1336, 1343-48 (Fed. Cir. 2010).  This question is a factual one that turns on whether

25  the subject matter of the continuation claims was adequately disclosed in the parent.  35 U.S.C. §

26  120; *Lockwood v. American Airlines Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997).  Because

27  resolution of the question depends upon intrinsic evidence and not extrinsic evidence that could be

28  destroyed or hidden, Hynix could not have been prejudiced in its assertion of the defense of

1   inadequate written description.

2       Accordingly, the court concludes that Hynix was not prejudiced in the assertion of its

3   invalidity defenses.

4           **3.      Unenforceablity Related to JEDEC Disclosure and Rambus's Intent**

5       The Federal Circuit concluded in the *Infineon* case, based upon evidence then available, that

6   the JEDEC disclosure obligation extended only to applications filed during membership.  *See Hynix*

7   *II*, 465 F.3d at 1349.  When the Federal Circuit reached this conclusion, Rambus already had

8   completed its three shred days.  Based upon the record before this court, it appears plausible that

9   spoliated evidence might have shed additional light on the scope of Rambus's disclosure obligation.

10  For example, there may have been JEDEC materials or documents indicating an understanding

11  among JEDEC members that they would disclose an intent to seek patent coverage of the SDRAM

12  standard.  *See Qualcomm Incorporated v. Broadcom Corp.*, 548 F.3d 1004, 1012 (Fed. Cir. 2008)

13  (concluding that the existence of a disclosure duty is a legal question with factual underpinnings, one

14  of which is the participants' understanding of the standard-setting body's policies).

15      Rambus argues that the Federal Circuit's determination in *Infineon* was final, and that this

16  court may not speculate as to how that determination may have been different if additional evidence

17  had been available at the time of the *Infineon* decision.  Rambus relies heavily upon the following

18  language from *Hynix II*:

19          Were this court writing on a clean slate, it would be tempted to agree that equity
            demands that Rambus's participation in JEDEC equitably estopped or waived its
20          claims against standard-compliant products, notwithstanding its delay in amending its
            claims until after its exit from JEDEC.  However, this court is not writing on a clean
21          slate.  *Infineon* involved a virtually identical factual situation.  Just as Hynix attempts
            to do here, "*Infineon* relie[d] on other applications [(i.e., not the patents in suit)]
22          Rambus had pending before its 1996 withdrawal from JEDEC."  *Id.* at 1102.  This
            court unequivocally held that the claims pending or issued during Rambus's JEDEC
23          tenure were not necessary to practice the standard because "substantial evidence does
            not support the finding that these applications had claims that read on the SDRAM
24          standard."  *Id.* at 1103 (emphasis added).  The phrase "these applications" did not
            refer to the patents-at-issue, but to Rambus's pending and issued patents during its
25          tenure in the standard setting organization.  Thus, there is no inconsistency in alleging
            that the claims pending during Rambus's participation in JEDEC were not reasonably
26          necessary to practice the standards, but that the claims prosecuted after Rambus's exit
            from JEDEC were.
27

28  *Hynix II*, 645 F.3d at 1339.

    FINDINGS OF FACT AND CONCLUSIONS OF LAW
    C-00-20905 RMW
                                        60

1   The Federal Circuit provided this guidance with respect to Hynix's waiver and estoppel

2   arguments "in the event the district court determines that Rambus did not spoliate documents, and/or

3   that Rambus's patents are not unenforceable." *Id.* at 1347.  Because it has concluded that in fact

4   Rambus did spoliate documents, the subject language does not foreclose this court from considering

5   whether evidence that was spoliated might have influenced the *Infineon* court's determination as to

6   the scope of a JEDEC member's duty to disclose.  The question is not the scope of Rambus's

7   disclosure obligation based upon the evidence presented in *Infineon* (which has been settled by the

8   Federal Circuit) but rather the impact of Rambus's spoliation of evidence upon the course of this

9   litigation.  One such impact is that Rambus's conduct may have skewed the Federal Circuit's analysis

10  in *Infineon*.  Had the *Infineon* court been afforded the opportunity to review all documents relevant

11  to JEDEC members' duty to disclose, the court may have reached a different legal conclusion with

12  respect to the scope of that duty, particularly given the Federal Circuit's observation that "there is a

13  staggering lack of defining details in the EIA/JEDEC patent policy." *Infineon*, 318 F.3d at 1102.

14  Rambus contends that its subjective understanding of the JEDEC disclosure obligation is

15  irrelevant because the disclosure standard is an objective one.  However, as noted above, the

16  existence of a disclosure duty is a legal question *with factual underpinnings*.  Rambus's destruction

17  of evidence related to such factual underpinnings could have affected the Federal Circuit's analysis of

18  the issue.  Clearly, the Federal Circuit's determination with respect to the disclosure obligation had a

19  significant impact on the course of the present litigation.

20  Even if none of the destroyed documents would have shed new light on the disclosure

21  obligation, there may have been internal Rambus documents containing information about Rambus's

22  plans to gain market power by using information learned at JEDEC meetings.  Such evidence could

23  have been relevant and given support to Hynix's equitable claims and defenses.

24  The court concludes that Hynix has made a plausible, concrete suggestion that it may have

25  been prejudiced by destruction of JEDEC-related documents, and that Rambus has not overcome this

26  suggestion of prejudice by clear and convincing evidence.

27  ### 4.    Documents Related to Rambus's Negotiations with Intel

28  Hynix has shown that Rambus's CFO, Harmon, destroyed documents pertaining to his

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1  negotiation with Intel in 1996.  *See* FF 163.  Rambus continued to have licensing discussions with

2  Intel after 1996.  Hynix suggests that other Intel-related documents may have been destroyed.

3  Documents related to negotiations with Intel would seem to have little potential relevance to the

4  issues between Hynix and Rambus, except to the extent that they may have revealed information as

5  to when Rambus became aware that Intel might turn away from the use of RDRAM in its processors.

6  This information could potentially support a conclusion that Rambus reasonably foresaw litigation

7  with Intel or one or more non-compatible manufacturers before the destruction of Rambus's back-up

8  tapes.  However, it is highly likely that such information, if it existed, could have been obtained from

9  Intel.

10          **5.      Other Destroyed Internal Documents**

11          The court concludes that Hynix has not made other concrete suggestions as to types of

12  documents that might have been destroyed to its prejudice.  Documents related to the licensing

13  relationship between Rambus and Hynix, and to Rambus Board materials, were maintained at least

14  to a large extent.  *See* FF 137-142, 165.  Hynix has not proffered a plausible, concrete suggestion as

15  to how it may have been prejudiced by destruction of any such documents.

16      **G.      Appropriate Sanction**

17          **1.      Discretion to Apply Unclean Hands Defense or Lesser Sanction for
                      Spoliation**

18

19          Having concluded that Rambus spoliated documents in bad faith and that Hynix has

20  established prejudice, the court must decide on an appropriate sanction.  The court has wide

21  discretion whether to hold the patents-in-suit unenforceable pursuant to Hynix's unclean hands

22  defense, or to impose a different sanction.  *See Keystone Driller,* 290 U.S. at 246-47 (1933); *Aptix*

23  *Corp. v. Quickturn Design Systems, Inc.,* 269 F.3d 1369, 1378 (Fed. Cir. 2001).  "Dismissal is a

24  'harsh sanction,' to be imposed only in particularly egregious situations where 'a party has engaged

25  deliberately in deceptive practices that undermine the integrity of judicial proceedings.'"  *Micron II,*

26  645 F.3d at 1328 (quoting *Leon*, 464 F.3d at 958).  "[T]he presence of bad faith and prejudice,

27  without more, do not justify the imposition of dispositive sanctions."  *Id.* at 1329.

28          In gauging the propriety of the sanction, the district court must take into account

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

"(1) the *degree* of fault of the party who altered or destroyed the evidence; (2) the *degree* of prejudice suffered by the opposing party; and (3) *whether there is a lesser sanction* that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid*, 13 F.3d at 79 (emphases added). *See also Leon*, 464 F.3d at 958 (noting that the district court must consider "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanction"). The sanction ultimately imposed must be commensurate with the analysis of these factors.

*Id.* (internal citations and quotation marks omitted) (emphasis in original).

In *Herson v. City of Richmond*, 2011 WL 3516162 (N.D. Cal. 2011), the court listed the ways a court may sanction parties responsible for spoliation of evidence.

First, a court may instruct the jury that it may draw an adverse inference against the party or witness responsible for destroying the evidence. Second, a court may exclude witness testimony based upon the destroyed evidence and proffered by the party responsible for destroying the evidence. Third, the court may dismiss the claim of the party responsible for destroying the evidence but this is only appropriate where a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings. Also, even when a moving party does not demonstrate prejudice, a court may impose monetary sanctions.

*Id.* at *4.

## 2. Rambus's Degree of Fault in Destroying Evidence

As discussed above, the evidence does not support a conclusion that Rambus deliberately shredded documents it knew to be damaging. However, Rambus did willfully destroy records when litigation was reasonably foreseeable. That destruction was part of a litigation plan. The destruction involved the shredding of large volumes of documents on multiple occasions. And finally, Rambus made no effort to log or record what was destroyed.

Hynix has made a plausible, concrete suggestion that it may have been prejudiced by destruction of JEDEC-related documents. Given Rambus's decision to expand its patent claims in response to information it obtained as a result of Crisp's attendance at JEDEC meetings, Rambus should have been particularly cautious in its maintenance of records related to JEDEC. Although the *Infineon* court ultimately decided that Rambus's disclosure obligation was limited to issued patents and pending applications, the scope of that obligation was not clear at the time the shred days occurred.

In summary, the court concludes that Rambus's fault was significant but not as great as that of a spoliator who knows of adverse evidence and specifically alters, hides or destroys that evidence. There is a possibility that Rambus did not destroy any evidence that would have been beneficial to Hynix's litigation position. However, because Rambus is the party that destroyed documents by the box and bag without keeping any record of what was destroyed, Rambus must suffer the consequences of that uncertainty. *See Anderson*, 862 F.2d at 925 ("[a]s between guilty and innocent parties, the difficulties created by the absence of evidence should fall squarely upon the former").

### 2.    The Degree of Prejudice Suffered by Hynix

As a result of Rambus's destruction of JEDEC related documents, Hynix was arguably prejudiced in its ability to litigate its equitable claims and defenses. Had Hynix prevailed on these claims and defenses, it could have obtained equitable relief from the royalty awarded against it in the patent phase of the trial for its manufacture, sale or import of product complaint with the industry standard SDRAM and DDR SDRAM specifications. Paying that royalty would place Hynix at a competitive disadvantage with at least Infineon and Samsung. Thus the degree of prejudice that Hynix will suffer absent an appropriate remedy is significant.

### 3.    Whether There Is a Lesser Sanction That Will Avoid Substantial Unfairness to the Opposing Party

This case involves a unique situation in that the dispute between Hynix and Rambus has been fully litigated at great expense to the parties and the public, and there has been considerable delay in getting the issues finally determined. A retrial of the case with either an adverse jury instruction or an evidentiary exclusion order would involve considerably more delay and expense. Hynix argues that dismissal is the only appropriate alternative remedy. However, the court is reluctant to impose a dispositive sanction given that Rambus's patents otherwise are valid and that Rambus's spoliation, while meeting the standards articulated above with respect to bad faith and prejudice, did not involve intentional destruction of particular damaging documents. Accordingly, the court declines to apply the unclean hands doctrine as a complete defense to Rambus's patent infringement claims. *See Seller Agency Council, Inc. v. Kennedy Center for Real*, 621 F.3d 981, 986 (9th Cir. 2010) ("The application of the equitable doctrine of unclean hands is within the discretion of the trial court").

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

1    The court instead exercises its discretion to fashion a remedy under its inherent power to

2  sanction spoliation.[10]  If Rambus had disclosed its intent to obtain patent coverage of the standards

3  being considered by JEDEC, Rambus would have been required, at a minimum, to make its patents

4  available to Hynix and others on a reasonable, non-discriminatory basis.[11]  If this case had not yet

5  been fully litigated, the court could have sanctioned Rambus by excluding any evidence of a royalty

6  rate greater than one set on a reasonable and non-discriminatory basis.  Such a sanction would have

7  addressed the prejudice Hynix is presumed to have suffered from Rambus's spoliation by insuring

8  that Hynix was not put at a competitive disadvantage in the marketplace.  However, trial has been

9  completed and a generous royalty rate has been awarded.

10    Under these circumstances, the court concludes that the sanction most commensurate with

11  Rambus's conduct and which addresses the above concerns is to strike from the record evidence

12  supporting a royalty in excess of a reasonable, non-discriminatory royalty.  Such a remedy recognizes

13  that Rambus's patents have been determined to be valid while at the same time recognizing that

14  Rambus's spoliation of evidence should preclude it from entitlement to a royalty that places Hynix at

15  a competitive disadvantage.  The parties shall submit supplemental briefs, not to exceed twenty

16  pages, addressing what a reasonable, non-discriminatory royalty rate would be with respect to the

17  patents-in-suit.  The briefing shall address specifically the royalty rates obtained by Infineon,

18  Samsung, and any other relevant competitors of Hynix.  Hynix's brief shall be submitted on or before

---

20    [10]    The court finds no merit to Rambus's contention that Hynix has waived the right to any sanction other than dismissal.

22    [11]    Various versions of the JEDEC manual provided language such as the following with respect to notice of patents or patent applications that reasonably might be necessary to practice the standard under consideration:

24    (1) a license shall be made available without charge to applicants desiring to utilize the patent for the purpose of implementing this standard(s), or
(2) *a license shall be made available to applicants under reasonable terms and conditions that are demonstrably free of unfair discrimination.*

26  EJA/JEDEC Patent Policy Summary 1993 (emphasis added).

1  October 12, 2012 and Rambus's response shall be submitted on or before October 26, 2012.  The

2  court will advise the parties whether the matter will be set for hearing or submitted without further

3  oral argument.

4       IT IS SO ORDERED.

5

6  DATED:   September 21, 2012

7                                                    _Ronald M. Whyte_

8                                                    RONALD M. WHYTE
                                                     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-00-20905 RMW

66